432 So.2d 877 (1982)
Joe R. FOOTE, et al.
v.
Diran SARAFYAN.
No. 12288.
Court of Appeal of Louisiana, Fourth Circuit.
December 1, 1982.
Rehearings Denied June 24, 1983.
*878 Charles E. McHale, Jr., New Orleans, for plaintiffs.
Pres Kabacoff, Jack Quarles, New Orleans, for defendant.
Michael D. Hunt, Breazeale, Sachse & Wilson, Baton Rouge, for third party defendant.
Felix R. Weill, Watson, Blanche, Wilson & Posner, Baton Rouge, for defendants in reconvention.
Before REDMANN, C.J., and BARRY and GULOTTA, JJ.
REDMANN, Chief Judge.
Defendant mathematics professor appeals from a judgment on a Commissioner's recommendation for a total of $20,000 damages from defendant's defaming the chairman and two fellow professors of mathematics at a state university. The judgment also dismissed defendant's reconventional demand for damages for defamation of himself, as well as his third-party demand against the university's insurer for indemnification and cost of defense.
The essential (but oversimplified) facts are that defendant pursued allegations of academic improprieties against appellees through university administration channels to conclusions unsatisfactory to defendant (notwithstanding defendant's partial success, in respect to one claim, to the extent that the administration did both remove one professora successful plaintiff in this casefrom a summer payroll and require him to refund $127.93 of the one check he had already received). Unsatisfied, defendant communicated his version of the alleged improprieties not only to the Attorney General's office and to the state Commission on Governmental Ethics (which declined jurisdiction) but also to the university newspaper (apparently at the request of a reporter), which published articles reporting the controversies from defendant's point of view. Plaintiffs, on the other hand, similarly and unsuccessfully sought through academic channels to have defendant removed from the mathematics faculty (or graduate faculty) on allegations of his harassment and disruptiveness (as well as certain other academic impropriety). These reciprocal allegations of impropriety constitute the defamation alleged in the main and reconventional demands.
*879 The trial court viewed the accusations within administrative channels as qualifiedly privileged but awarded damages for defendant's publishing his charges through the university newspaper. Defendant alone appeals.
We reverse the judgments against defendant as irreconcileable with constitutional guarantees of free speech, U.S. Const. Amend. 1 and La. Const. art. 1 § 7, and as unsupported by ordinary law of defamation, see Restatement Torts 2d § 566.
In respect to the chairman and another plaintiff who was then an assistant professor, some added factual circumstances of the impropriety published were that, although the professor had been invited on May 10 to participate in a July 3-28 New York conference (itself an honor), the chairman and that professor continued with plans to assign classes to him for the summer term beginning in mid-June and consequently to pay him a salary for that summer term. Furthermore, there had to be some foreknowledge and previous consent that that professor might not return at the end of the conference, because he simply so informed the chairman by letter (when his parents joined him, his wife and children in New York). That professor had arranged for another to take over his classes (and thus to exceed 100% normal workload while other professors were allowed and paid for only a two-thirds workload) and intended to pay the other, so that the students were not abandoned and suffered no more than a change in professor less than halfway through the term to a professor who had an overload of work. But the proof of the fiscal aspect of the impropriety was that, immediately on hearing of it from defendant, the university administration removed that professor from the payroll and obliged him to return $127.93 in already-received pay. Defendant originally characterized this arrangement as a payroll irregularity but after consulting with the attorney general's office changed his characterization to "payroll fraud," a term presumably derived from "public pay roll fraud," condemned by a criminal statute, La.R.S. 14:138.[1]
That characterization was given prominence in the school newspaper articles, which otherwise reasonably adequately reported the facts (although from a somewhat sensational point of viewe.g., not until towards the end of the article did it report that the classes were in fact conducted although by another professora circumstance surely attributable not to defendant but to the newspaper).
In respect to the other successful plaintiff, a then associate professor, some added circumstances are that that professor, when applying for employment in December 1966, in a "biographical data sheet" provided by the university, in the space for "Publications," listed "Research papers," citing 14, and then:
Books:
1. Principles of Computational Mathematics, vol. 1 (coauthorship with C.R. Marathe).
2. Numerical analysis for Engineers.
3. FORTRAN: Theory and Practice.

*880 All these books are under publication by Manaktalas, Bombay, and are scheduled to be out in 1967.
Defendant described this book listing as "deceit" of the university and "false pretenses" and those descriptions were published by the newspaper. The evidence, especially the contracts between that professor and the publisher that were dated March 1967 and that obliged the delivery of two book manuscripts to the publisher by June and July of 1967, fairly establishes that (notwithstanding that professor's testimony to the contrary) the manuscripts had not been delivered to the publisher in December 1966.
Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), held that a state university adjunct professor who was also director of research at a state hospital and who had received $500,000 in federal research grants was not, not even in respect to his federally-supported research, a public official within New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), nor a public figure within Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). We therefore conclude that our plaintiffs are not limited by the actual malice test of Sullivan or Butts but by the lesser requirements of Gertz v. Robert Welch Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. 789 (1974), in respect to liability. But even under Gertz, on First Amendment grounds, 418 U.S. at 349, 94 S.Ct. at 3011,
the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or a reckless disregard for the truth.
The case before us is not a case of knowing falsity or reckless disregard for the truth. It is at best a case of harsh opinion on truth, and mere harsh opinion does not result in liability for defamation; Mashburn v. Collin, 355 So.2d 879, 96 ALR3d 590 (La.1977). This is not a case of naked allegation of crime but of publication of the underlying facts with substantial accuracy coupled with publication of the harsh opinion whose merit readers might decide for themselves.[2]
Although the trial court commissioner declined to allow testimony on that point from the assistant attorney general with whom defendant consulted, the harsh opinion that the department chairman's and the one professor's actions amounted to payroll fraud is not so clearly insupportable as to eliminate the possibility that defendant was so advised. We deem it unnecessary to decide that the proven impropriety did as a matter of law constitute payroll fraud; that must remain a matter of opinion rather than of truth or falsity. We decide only that defendant's so characterizing it was not an abuse of the freedom of speech guaranteed by the First Amendment but a fair, although harsh, comment on the behavior that in fact occurred. We similarly view defendant's characterization of the second professor's book-publication claim as "deceit" of the university and "false pretenses" (notwithstanding the trial court commissioner's kinder characterization of the claim as "meaningless puffery"): it too is harsh, but not so unfair a comment as to impose liability as for defamation.
Although Cangelosi v. Schwegmann Bros., 390 So.2d 196, 198 (La.1980) declares obiter that "words which impute a crime to another are defamatory per se ...," we have noted that the allegation of payroll fraud was published in the context of the facts upon which the allegation was based. Because the facts speak for themselves, the same harm does not result as would from a naked allegation of crime without its factual context. Readers in the academic community were informed of the underlying facts and can hardly be unaware that absences from class for reasonable periods to participate in seminars at meetings of learned societies are commonplace. If the *881 facts had been, for example, that a professor had missed one week for such a purpose, no academician would have taken seriously anyone's opinion that that constituted payroll fraud. But the fact that one is absent over half a term may raise questions, especially when he is obliged by the university to refund salary. Justice Holmes's words, in Gandia v. Pettingill, 222 U.S. 452, 458, 32 S.Ct. 127, 128, 56 L.Ed. 267 (1911), are appropriate: "what really hurt the plaintiff was not the comment but the fact."
Restatement Torts 2d § 566 declares the law:
A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is only actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.
Comment a adds:
If the expression of opinion was on a matter of public concern, it was a form of privileged criticism, customarily known by the name of fair comment. The privilege extended to an expression of opinion on a matter of public concern so long as it was the actual opinion of the critic and was not made solely for the purpose of causing harm to the person about whom the comment was made, regardless of whether the opinion was reasonable or not.
See also Carman, "Hutchinson v. Proxmire and the Neglected Fair Comment Defense: An Alternative to Actual Malice," 30 DePaul L.Rev. 1 (1980).
We add, quoting Gertz v. Robert Welch, Inc., supra, 418 U.S. at 339, 94 S.Ct. at 3006:
Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.
Finally, on defendant's third-party demand against the university's insurer, we reverse and award the cost of defense. The question is whether "Coverage P" (form Liab. 6688B) ("Personal Injury Liability Insurance") is affected by "Additional Insured (Employees)" (form Liab. 6391C), making employees insureds as to "Comprehensive General Liability Insurance." The question thus becomes whether coverage P is part of the "Comprehensive General Liability Insurance" (as by endorsement) or not. Our reasoning is that the policy contains only two basic insurances, namely automobile liability and general liability, and that coverage P is made a part of the general liability coverage; and the addition of employees as insureds to the "Comprehensive General Liability Policy" makes them insureds as to the general liability insurance (including coverage P).
We first observe that there is only one insurance policy, with many endorsements. The policy on its cover is titled "Liability Insurance PolicySection One (For Automobile Insurance or General Liability Insurance separately or combined)." That persuades us that there are only two insurances (and thus Coverage P must be one or the other). Because coverage P is against liability for damages from "offenses" such as "libel and slander," it hardly seems to be automobile insurance. Moreover, all automobile liability attachments are given form numbers beginning "Auto," while coverage P's form bears a number beginning "Liab.," as do all the other non-automobile attachments. Furthermore, in the form "New & Renewal Policy Order" (form B8552), "Pers. Inj. [form no.] 6688" is described as one of nine "Coverage Parts" of "General Liability." And finally, in original and two corrected versions of "General Liability Schedule and Premium Analysis," the penultimate of many charges is for "Personal Injury." We have already stated our conclusion. The "personal injury liability insurance" is part of the general liability half of the policy. "Additional Insured (Employees)" makes defendant an insured against liability for libel and slander, expressly entitled as an insured to a defense.
Making allowance for the fact that any defense-provider would have had substantial benefit from defense counsel's services in depositions, evidence-gathering etc. prior *882 to defendant's March 1978 demand upon the insurer, and then allowing counsel's $45 contractual charge per hour, for time in preparation and lengthy trial (while disallowing time spent in matters other than defense of the main demand, especially the reconvention), and estimating the time spent in this appeal, we conclude that the reasonable and necessary cost of defense of the action of defamation against defendant approximates $9,000 (200 hours) through trial and $1,800 (40 hours) on appeal.
The judgment on the main demand is reversed and it is dismissed at plaintiffs' costs; and there is judgment on the third party demand in favor of Diran Sarafyan and against Niagara Fire Insurance Company for $10,800, with interest on $9,000 from date of the trial court's judgment and on $1,800 from date of this judgment, and all costs of the third-party action against Niagara. Dismissal of the reconventional demand is affirmed.

On Applications for Rehearing
PER CURIAM.
We amend our judgment as to costs only, to cast plaintiffs for half and defendant for half of all costs other than the costs of defendant's third-party action against Niagara, for which Niagara alone remains cast.
We otherwise refuse rehearing, although for any reviewing court we respond to two complaints of omissions in our original opinion and to one argument by the insurer.
We omitted discussion of defendant's letter to the university president charging improprieties. We answered the legal question by noting that the trial judge viewed accusations within administrative channels as qualifiedly privileged.
We omitted discussion of defendant's statements to some faculty members that one plaintiff had practiced some form of medicine or witchcraft in India, causing 23 deaths. The trial commissioner did not believe defendant's testimony that plaintiff himself told that story to defendant, but the commissioner's report treats this matter as de minimis, concluding "The statements in any event were not widely disseminated and the very bizarre behavior attributed to [that plaintiff by defendant] would not ordinarily be believed by persons of normal intelligence." The commissioner did not recommend an award of damages for these statements; he concluded, as to this plaintiff, only that the newspaper publication of the deceit allegation was compensable. The commissioner further recommended that all other demands between the parties be dismissed. Our view is that there was no award on the basis of these allegations. Plaintiffs did not appeal and the question of whether an award should have been made is not before us.
The insurer argues that defendant, employed as a mathematics professor, was in no case insured because his actions complained of by plaintiffs were not in the course and scope of that employment. We reject that argument because to accept it would tell public employees that they have no duty to tell their supervisors (and, if necessary, the public) when they see fellow employees violating the terms of their public employment.
NOTES
[1] Public pay roll fraud is committed when:

(1) Any person shall knowingly receive any payment or compensation, or knowingly permit his name to be carried on any employment list or pay roll for any payment or compensation from the state, for services not actually rendered by himself, or for services grossly inadequate for the payment or compensation received or to be received according to such employment list or pay roll; or
(2) Any public officer or public employee shall carry, cause to be carried, or permit to be carried, directly or indirectly, upon the employment list or pay roll of his office, the name of any person as employee, or shall pay any employee, with knowledge that such employee is receiving payment or compensation for services not actually rendered by said employee or for services grossly inadequate for such payment or compensation.
This article shall not apply in a situation where a bona fide public officer or public employee, who is justifiably absent from his job or position for a reasonable time, continues to receive his usual compensation or a part thereof.
Whoever commits the crime of public pay roll fraud shall be fined not more than one thousand dollars, or imprisoned, with or without hard labor, for not more than two years, or both.
[2] The student newspaper quoted from the criminal statute reproduced at n. 1, but omitted its third paragraph, which excepts from the statute's application the case of an employee "justifiably absent from his job ... for a reasonable time ...." This omission, however, cannot be attributed to defendant because he did not write the newspaper article.