[Civ. No. 41924. First Dist., Div. One. Oct. 23, 1979.]

VIRGINIA T. FRANKLIN, Plaintiff and Appellant, v.
BENEVOLENT AND PROTECTIVE ORDER OF ELKS,
LODGE NO. 1108 et al., Defendants and Respondents.

916

918

## COUNSEL

Carnes & Bailey and Don E. Bailey for Plaintiff and Appellant.

Elise Snyder as Amicus Curiae on behalf of Plaintiff and Appellant.

Pillsbury, Madison & Sutro, John A. Sutro, Jr., and Walter R. Allan for Defendants and Respondents.

## OPINION

**MARTIN, J.\***—Appellant Virginia T. Franklin sued respondents Benevolent and Protective Order of Elks of the United States of America (the

*Assigned by the Chairperson of the Judicial Council.

Elks), and San Rafael Elks Lodge No. 1108 (Lodge 1108), for libel. She appeals from a summary judgment in favor of respondents. We reverse the judgment.

The facts relevant to the issues dispositive of this appeal are essentially uncontradicted. Appellant was a teacher in the social sciences department at San Rafael High School. For a unit on propaganda which analyzed the political philosophies and techniques of various groups, in her class on American government, and pursuant to a course outline approved by the board of education, appellant selected, copied, and distributed to her students excerpts from a book called Movement Toward a New America. The book, parts of which are in the record, appears to be a pastiche of underground writings concerning revolution, sex, and drugs, vividly illustrated and replete with vulgar language. Appellant regarded the book as "an encyclopedia of propaganda of the '60s" and used it "to expose leftwing propaganda and militant Black rhetoric, etc." She "did not consider the book to be a 'shocker' or one which would offend any student."

Appellant decided to obtain a set of the books for classroom use and ordered several copies, as a supplementary text, through her acting department chairman, who approved her use of the book. When the books arrived, students helped carry them to appellant's classroom. One student asked and received permission to take a copy home, but then left the book at her boyfriend's house. The boyfriend's father brought the book to the attention of Lodge 1108 and the lodge immediately protested the use of the book to the board of education. The board of education held a public hearing regarding use of the book, and its suitability as instructional material was vigorously debated. At that meeting, appellant offered to withdraw the book and instead to use only selected excerpts from it. When the meeting did not result in total withdrawal of the book from the curriculum at San Rafael High School, the lodge initiated a "citizens request for reconsideration of instructional materials" under school district regulations. This procedure involved consultations between district personnel and the complainants and several meetings of a special committee drawn from district personnel, and culminated in a committee recommendation for action by the superintendent of schools subject to approval by the board of education. Appellant was required by district regulations to participate and cooperate in the reconsideration procedure, and she did so in order "to explain to those interested the way in which the book was used, the parts that were used, and how it fit into my class in

American Government." She "did not intend, nor did I in fact, become involved in the controversy beyond what was required of me." The entire process was reported in several news stories and editorials in the local newspaper.

The committee recommended to the superintendent that the book *not* be withdrawn but that it "should not be placed in the hands of students without guidance from the teacher." The superintendent recommended to the board of education that the board "limit the use of the . . . textbook . . . to certain specific and selected excerpts as identified by the teacher, and that the issuance of the textbook to students be discontinued." The board of education adopted the superintendent's recommendation in December 1971.

Once the board of education had acted, the Americanism Committee of Lodge 1108 compiled a set of newspaper clippings and correspondence reflecting their efforts, in the form of a "preface" written by the Americanism Committee chairman, and delivered these materials to representatives of the national Elks organization. The director of public relations for the Elks, with the approval of the business manager of the Elks' national publication, The Elks Magazine, then wrote and published in the October 1972 issue of the magazine an editorial which strongly criticized the book and its use as instructional material, reporting the action of the board of education, and concluding as follows: "Incredible? Yes . . . but it is even more interesting to note that the teacher who introduced the book into the school had been relieved from teaching the same sort of rot in the Paradise, California school system. The American Legion and aroused parents caused her dismissal there. She was turned down in 62 other school systems before being hired at San Rafael. She is still teaching there and is a director of the Northern California Civil Liberties Union. Is this the sort of 'teacher' we want in our school system? The Order of Elks would emphatically say, 'NO!' [¶] We do not advocate thought control groups as they exist in dictatorships. We have always supported education and freedom of speech and expression . . . but nobody except a truly fuzzy-minded thinker would say we should permit this nation to be overthrown by such revolutionaries as wish to expound their communist, Godless philosophies to our young people in the very institutions which were conceived, built and operated under the system of government we are blessed to call the United States of America."

The editorial was brought to the attention of appellant who promptly wrote to The Elks Magazine pointing out "error in fact and . . . clear

misunderstanding" in the editorial and requesting a retraction. Among other things appellant denied that she had ever been fired or asked to resign at Paradise and that she was ever "turned down" in any school district. The Elks published appellant's letter (deleting a paragraph in which she had stated her church affiliation and certain of her educational credentials) in a subsequent issue of The Elks Magazine, adding an editorial note which stated, among other things, that "Our review of the questioned book only causes us to reiterate our opinion."

Appellant then sued for libel.

Respondents' motion for summary judgment was based on the contention that appellant could not establish, as an essential element of her case, that the alleged libels were published with actual mal- ▮ ▮ "If the defendants' declarations in support of a motion for summary judgment establish a complete defense to plaintiff's action or demonstrate an absence of an essential element of plaintiff's case, and the plaintiff's declaration in reply does not show that a triable issue of fact with respect to that defense or that essential element exists, no amount of factual conflicts upon other aspects of the case will affect the result and the motion for summary judgment should be granted. (*Smith* v. *Southern Pacific Co.*, 222 Cal.App.2d 728, 733 . . . .)" (*Frazier, Dame, Doherty, Parrish & Hanawalt* v. *Boccardo, Blum, Lull, Niland, Teerlink & Bell* (1977) 70 Cal.App.3d 331, 338 [138 Cal.Rptr. 670].) The trial court granted respondents' motion, concluding, first, that because appellant was a public figure actual malice was an essential element of her case and, second, that the record demonstrated as a matter of law that respondents had published without such actual malice. Judgment was entered for respondents and this appeal followed.

▮ We disagree with the trial court's conclusion that appellant was a public figure and thus required to prove actual malice, and we reverse on that ground. Therefore we need not and do not consider the validity of the trial court's determination that there was no triable issue of fact with respect to actual malice.

▮ Not every cause of action for libel requires as an essential element that actual malice be shown. In general, "Libel is a false and unprivileged publication by writing, printing, picture, effigy or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a

tendency to injure him in his occupation" (Civ. Code, § 45).  ▮  One of the several types of *privilege* which may operate to immunize the publisher of an otherwise libelous statement from liability is the qualified constitutional privilege, founded in the First Amendment and extended to state court libel actions by the Fourteenth Amendment of the United States Constitution, to comment with relative impunity upon individuals who are "public officials" (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706, 95 A.L.R.2d 1412]) or "public figures" (*Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 162 [18 L.Ed.2d 1094, 1115, 87 S.Ct. 1975]). If a publication concerning a public official or a public figure would otherwise be libelous it will be actionable only if the plaintiff can establish that the publication was made with actual malice, which is to say "with knowledge that it was false or with reckless disregard of whether it was false or not" (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 280 [11 L.Ed.2d at p. 706]). Thus, where it appears that the libelled plaintiff was a public official or a public figure, proof of actual malice will as a practical matter be an essential element of plaintiff's case. But if the plaintiff is neither a public official nor a public figure the qualified constitutional privilege will not apply, even though the plaintiff may in some sense have been involved in, and the allegedly libellous statement may have pertained to, a public *issue* of perceived importance (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 344-348 [41 L.Ed.2d 789, 807-810, 94 S.Ct. 2997]).

Respondents argued below that appellant was required to prove actual malice for the reason that she was both a public official and, in relevant respects, a public figure. To reach the question whether there was a triable issue of fact as to actual malice, it was therefore necessary for the trial court to find that appellant was either or both. The facts pertaining to this preliminary determination were essentially uncontradicted: from them the trial court concluded as a matter of law that appellant was not a public official but was a public figure. We agree that appellant was not a public official, but we disagree with the trial court's legal conclusion that appellant was a public figure.

1. *Public Official*

Respondents argue that *as a school teacher* appellant was a public official.  ▮  It is uncontested that appellant was a school teacher: The only issue for the trial court to resolve was whether as a matter of law a school teacher is a public official within the meaning of *New York Times*

*Co.* v. *Sullivan, supra,* 376 U.S. 254. The trial court correctly concluded that a school teacher is not a public official but, as earlier stated, in our view erred in deeming her to be a public figure.

The *New York Times* privilege represents a painstaking balancing of two critically important but not always wholly compatible rights: freedom of expression, and sanctity of reputation. *New York Times* was considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (376 U.S. at p. 270 [11 L.Ed.2d at p. 701].) The Supreme Court recognized "That erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' " (376 U.S. at pp. 271-272 [11 L.Ed.2d at p. 701]). " 'Cases which impose liability for erroneous reports of the political conduct of officials reflect the obsolete doctrine that the governed must not criticize their governors. . . . The interest of the public here outweighs the interest of appellant or any other individual. The protection of the public requires not merely discussion, but information. Political conduct and views which some respectable people approve, and others condemn, are constantly imputed to Congressmen. Errors of fact, particularly in regard to a man's mental states and processes, are inevitable. . . . Whatever is added to the field of libel is taken from the field of free debate.' " (376 U.S. at p. 272 [11 L.Ed.2d at p. 702], quoting from *Sweeney* v. *Patterson* (D.C.Cir. 1942) 128 F.2d 457, 458.)

But *New York Times* expressly did not decide "how far down into the lower ranks of government employees the 'public official' designation would extend" (376 U.S. at p. 283, fn. 23 [11 L.Ed.2d at p. 708]). In *Rosenblatt* v. *Baer* (1966) 383 U.S. 75 [15 L.Ed.2d 597, 86 S.Ct. 668], the Supreme Court noted that it need not precisely define "public official" for purposes of that case, then generalized that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs" (383 U.S. at p. 85 [15 L.Ed.2d at p. 605]), but then limited the generalization: "[A] conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that

conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy" (383 U.S. at pp. 86-87, fn. 13 [15 L.Ed.2d at p. 606]; cf. also *Peoples* v. *Tautfest* (1969) 274 Cal.App.2d 630, 636 [79 Cal.Rptr. 478]).

Respondents urge that a public high school teacher necessarily occupies a position which, independent of particular issues, "would invite public scrutiny and discussion." This may well be so. But it does not necessarily follow that a public high school teacher is therefore a public official within the meaning of *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254. Implicit in the reasoning of *New York Times* and of *Rosenblatt* is the concept of a freedom of the *governed* to question the *governor,* of those who are influenced by the operation of government to criticize those who *control* the conduct of government. The governance or control which a public classroom teacher might be said to exercise over the conduct of government is at most remote and philosophical: Far too much so, in our view, to justify exposing each public classroom teacher to a qualifiedly privileged assault upon his or her reputation. In *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, the Supreme Court points out that extension of the qualified constitutional privilege to those who comment upon public officials is to be rationalized in part by the consideration that "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs." (418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) We are unwilling to hold that a school teacher must be deemed to have assumed the risk of nonmalicious defamation. We perceive in such a rule a real and intolerable danger to the freedom of intellect and of expression which the teacher must have to teach effectively.

We conclude that an appropriate balancing of freedom of expression against sanctity of reputation does not require, and that appropriate regard for the role of the classroom teacher in our society should not permit, extension of the public official concept to a school teacher "entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." (383 U.S. at pp. 86-87, fn. 13 [15 L.Ed.2d at p. 606].) Accordingly we agree with the trial court that appellant was not a "public official" within the meaning of *New York Times.* We acknowledge that appellate courts in two other states have concluded to the contrary that public school teachers are "public

officials" (*Johnston* v. *Corinthian Television Corp.* (Okla. 1978) 583 P.2d 1101, 1102-03; *Basarich* v. *Rodeghero* (1974) 24 Ill.App.3d 889 [321 N.E.2d 739, 742]); we respectfully disagree with the conclusions reached by those courts.

### 2. *Public Figure*

Respondents contend, alternatively, that appellant was a "public figure" whose action for libel would therefore be subject to the qualified constitutional privilege under the holdings of a line of cases derived from *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, and headed by *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. 130. The plurality opinion in *Butts* stated the philosophical basis for an extension of the *New York Times* privilege to libel claims asserted by "public figures": "From the point of view of deciding whether a constitutional interest of free speech and press is properly involved in the resolution of a libel question a rational distinction 'cannot be founded on the assumption that criticism of private citizens who seek to lead in the determination of . . . policy will be less important to the public interest than will criticism of government officials.' " (388 U.S. at pp. 147-148 [18 L.Ed.2d at p. 1107], quoting *Pauling* v. *Globe-Democrat Publishing Co.* (8th Cir. 1966) 362 F.2d 188, 196.) Chief Justice Warren, concurring in *Butts,* was more specific: "[i]t is plain that although they are not subject to the restraints of the political process, 'public figures,' like 'public officials,' often play an influential role in ordering society. And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities. Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials.' The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct." (388 U.S. at p. 164 [18 L.Ed.2d at p. 1116].)

Shortly after *Butts* was decided the Supreme Court in another plurality opinion took the position that a libel plaintiff's *status* as a public or a private person was not determinative of the availability of the qualified constitutional privilege: "We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending

constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." (*Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29, 43-44 [29 L.Ed.2d 296, 312, 91 S.Ct. 1811].)

But this extension of the privilege was shortlived. In 1974 the Supreme Court repudiated the "matters of public or general concern" test, returning to a distinction between "public persons" (including both "public officials" and "public figures") and "private individuals": "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold government office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. . . . We think that [*New York Times* and *Butts*] are correct, but we do not find their holdings justified solely by reference to the interest of the press and broadcast media in immunity from liability. Rather, we believe that the *New York Times* rule states an accommodation between this concern and the limited state interest present in the context of libel actions brought by public persons. For the reasons stated below, we conclude that the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." (*Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. 323, 342-343 [41 L.Ed.2d 789, 807].) Seeking rules of general application despite an acknowledged risk of overgeneralization, *Gertz* pointed out that "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. [Fn. omitted.] Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." (418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) Further, "An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. . . . [¶] Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are

deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. [¶] Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual." (418 U.S. at pp. 344-345 [41 L.Ed.2d at p. 808].) *Gertz* concludes "that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual. The extension . . . proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable." (418 U.S. at pp. 345-346 [41 L.Ed.2d at p. 809]; cf. also *Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 432-433 [142 Cal.Rptr. 304].)

Once *Gertz* had made clear that it was a matter of constitutional importance that courts be able, in a libel case, to distinguish between a plaintiff who was a private individual and one who was, in the requisite sense, a "public figure," the courts found it necessary to determine with more particularity exactly what the identifying and distinguishing characteristics of a "public figure" were. In *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958], the Supreme Court appeared to retreat from *Gertz'* suggestion that "it may be possible for someone to become a public figure through no purposeful action of his own," holding that a woman prominent in social circles did not become a "public figure" simply by having been "compelled to go to court by the State in order to obtain legal release from the bonds of matrimony," or by holding "a few press conferences during the divorce proceedings in an attempt to satisfy inquiring reporters." (424 U.S. at pp. 454-455, fn. 3 [47 L.Ed.2d at p. 163].)

Recently in *Wolston* v. *Reader's Digest Assn., Inc.* (1979) 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701], the Supreme Court dealt more specifically with factors which control whether or not a particular plaintiff is a "public figure." Wolston, who had been undergoing interrogation with respect to the activities of Soviet intelligence agents in the United States, failed to respond to a grand jury subpoena. He subsequently pleaded guilty to contempt charges and received a suspended sentence.

These proceedings were attended by considerable newspaper publicity, but Wolston then returned to relative obscurity until, some 16 years later, a publisher named him as one of several "Soviet agents identified in the United States." He sued for libel; the publisher asserted the qualified constitutional privilege on the ground that Wolston had become a "public figure." Lower courts agreed with the publisher; the Supreme Court reversed. Particularizing its comments to the facts before it, the Supreme Court said: "[T]he mere fact that petitioner voluntarily chose not to appear before the grand jury, knowing that his action might be attended by publicity, is not decisive on the question of public figure status. . . . [A] court must focus on the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' . . . [P]etitioner never discussed this matter with the press and limited his involvement to that necessary to defend himself of the contempt charge. . . . [¶] [T]he simple fact that these events attracted media attention also is not conclusive of the public figure issue. A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced . . . in *Rosenbloom* . . . . We repudiated this proposition in *Gertz* and in *Firestone*, however, and we reject it again today. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*. . . . [¶] Nor do we think that petitioner engaged the attention of the public in an attempt to influence the resolution of the issues involved. Petitioner assumed no 'special prominence in the resolution of public questions.' . . . In short, we find no basis whatsoever for concluding that petitioner relinquished, to any degree, his interest in the protection of his own name." (443 U.S. at p. 168 [61 L.Ed.2d at p. 460-461].)

The Supreme Court in *Wolston* v. *Reader's Digest Assn., Inc., supra,* further cited its language in *Time, Inc.* v. *Firestone, supra,* 424 U.S. at page 457 [47 L.Ed.2d at page 165], stating these observations remain sound: "[W]hile participants in some litigation may be legitimate 'public figures,' either generally or for the limited purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of

defamation would otherwise afford them simply by virtue of their being drawn into a courtroom. The public interest in accurate reports of judicial proceedings is substantially protected by *Cox Broadcasting Co.* [v. *Cohn* (1975) 420 U.S. 469 (43 L.Ed.2d 328, 95 S.Ct. 1029)]. As to inaccurate and defamatory reports of facts, matters deserving no First Amendment protection . . ., we think *Gertz* provides an adequate safeguard for the constitutionally protected interests of the press and affords it a tolerable margin for error by requiring some type of fault."

In *Hutchinson* v. *Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675] petitioner, whose scientific study of emotional behavior was federally funded, sued the respondent, a United States Senator, for defamation alleging that the Senator's bestowal upon him of a "Golden-Fleece-of-the-month award" and its nationwide publication, had damaged him in his professional and academic standing. The court held the petitioner was not a "public figure" so as to make the "actual malice" standard of proof of *New York Times Co.* v. *Sullivan, supra*, 376 U.S. 254, applicable. It concluded: "Neither the fact that local newspapers reported the federal grants to petitioner for his research nor the fact that he had access to the news media as shown by reports of his response to the announcement of the Golden Fleece Award, demonstrates that he was a public figure prior to the controversy engendered by that award. His access, such as it was, came after the alleged libel and was limited to responding to the announcement of the award. Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure. Nor is the concern about public expenditures sufficient to make petitioner a public figure, petitioner at no time having assumed any role of public prominence in the broad question of such concern."

In our view the definition of "public figure" which has evolved from *Butts* through *Gertz, Firestone* and *Wolston* incorporates as an element a requirement that the libel plaintiff must have voluntarily and actively sought, in connection with any given matter of public interest, to *influence* the resolution of the issues involved. To us it seems clear that only by such voluntary and active participation could an individual be said to have "relinquished . . . his interest in the protection of his own name." The considerably broader definition suggested by this district in *Montadon* v. *Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938, 946

[120 Cal.Rptr. 186, 84 A.L.R.3d 1234], was taken directly from a federal case decided shortly after *Butts* and before *Gertz, Firestone* and *Wolston,* and appears to us to have been superseded by the later United States Supreme Court decisions.

Respondents tendered in support of their motion for summary judgment, in addition to materials plainly directed to the actual malice issue, a voluminous collection of clippings from newspapers and from a newsmagazine, relating both to the San Rafael textbook controversy and to an episode several years earlier, in Paradise, California, in which appellant had experienced a similar confrontation over her teaching methods with the local American Legion post. ▮ It is elementary that affidavits in support of a motion for summary judgment shall contain, and may be considered only to the extent that they contain, admissible evidence (Code Civ. Proc., § 437c; 4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, §§ 180-187, pp. 2832-2837). It is clear that, by virtue of the hearsay rule (Evid. Code, § 1200 et seq.), respondents' collection of clippings was not admissible evidence of the facts stated therein, but could be competent evidence only of the fact that appellant had received a considerable amount of publicity.

Appellant countered this showing with declarations which competently established that her only relevant overt act in San Rafael was to order several copies of the book in question and that thereafter she had participated in the controversy inspired by the book only to the extent required by school regulations or made necessary by inquiries from the media. So far as relevant to the question whether appellant was a public figure, the parties' showings raise no substantial factual conflict, and the determination became a question of law.

Respondents concede that appellant did not occupy a position of such persuasive power and influence as to be a public figure for all purposes, and further concede that the events in Paradise would not in and of themselves make appellant a "public figure" with respect to the San Rafael controversy which gave rise to the alleged libel.

It remains to be determined whether the events in San Rafael established appellant as a "public figure" with respect to the controversy over the book. ▮ We conclude, in light of the decisions of the United States Supreme Court, that appellant was not a public figure. In the course of her teaching duties she simply made a selection of teaching

materials which, for all that appears, was in good faith and for the purpose of discharging her teaching duties. There is no showing that appellant ordered the book for the purpose of inciting controversy. She declares without contradiction that she did not anticipate controversy. It is not clear that, but for the vigorous reaction of Lodge 1108, there would ever have been a controversy. At the public meeting at which the Elks' complaint was first discussed appellant offered to withdraw the book and to use, instead, copied excerpts of the type she had used during the preceding school term without complaint or controversy. The record contains no indication that any of appellant's subsequent activities in connection with the controversy extended beyond what was required of her by school district regulations or to respond to inquiries initiated by the media. Appellant did not call press conferences, take her case to the public in an attempt to influence resolution of the issues, or in any other sense assume "special prominence" beyond that which Lodge 1108 thrust upon her. For all that appears of record appellant simply maintained her aplomb and waited for the issue raised by Lodge 1108 to be resolved. The evolution of the "public figure" rules from *Butts* through *Wolston* makes clear that appellant did not relinquish her interest in the protection of her own name.

Since appellant was not and did not become a public official or public figure, but instead maintained her status as a private individual so far as relevant to her claims against respondents, she was not required to show that respondents had published with actual malice (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 347-348 [41 L.Ed.2d 789, 809-810]).

The judgment is reversed.

Elkington, Acting P. J., and Newsom, J., concurred.

A petition for a rehearing was denied November 21, 1979, and respondents' petition for a hearing by the Supreme Court was denied December 20, 1979.