[No. F008696. Fifth Dist. Oct. 26, 1988.]

PAUL MOSESIAN, Plaintiff and Appellant, v.
McCLATCHY NEWSPAPERS et al., Defendants and Respondents.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Nuttall, Berman & Magill and Roger T. Nuttall for Plaintiff and Appellant.

Diepenbrock, Wulff, Plant & Hannegan, William Shubb, Charity Kenyon Gibson, Dunn & Crutcher, Rex S. Heinke, Kelli L. Sager and Thomas E. Kotoske for Defendants and Respondents.

## OPINION

**WOOLPERT, J.**—This appeal follows orders granting summary adjudication and summary judgment in favor of defendants in a defamation action. The trial court first ruled plaintiff was a public official and candidate for public office at the time of the publications. Later, on the summary judgment motion, the court determined plaintiff's evidence was of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence, thereby establishing a defense under *New York Times* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]. Plaintiff challenges both orders. On review, we conclude the court erred by granting summary adjudication on the issue of "public official." However, we also find the court properly found no triable issue of fact on actual malice, a question which may be of importance on remand.

Plaintiff Paul Mosesian sued defendants McClatchy Newspapers, Frank McCulloch (an executive editor with McClatchy Newspapers), and three Fresno Bee reporters for defamation based upon a number of articles and an editorial published in the Fresno Bee in 1980 and 1981. The first article reported the California Horse Racing Board (CHRB) had done an inadequate job of investigating the Calfax Racing Association, and specifically plaintiff, who had an interest in the association, before issuing the association a license to conduct the 1980 spring horse race meet at the Fresno County Fairgrounds. The piece disclosed allegedly unfavorable information concerning plaintiff which the defendant investigative reporters had uncovered, the inference being CHRB would not have granted the license had they been aware of the information. It also noted Calfax had applied for a license to conduct a similar 1981 meet.

Defendants repeated the challenged material in reporting plaintiff's and the CHRB's responses to the first article. An editorial which called for more thorough investigations by the CHRB also referred to the earlier information reported about plaintiff. Those charges are not repeated here as they are not necessarily germane to the disposition of this case.

Several years into the case, defendants moved for summary adjudication of issues. In relevant part they argued plaintiff was a "public official" and candidate for "public office" by virtue of: (1) his interest in Equestra Corporation and its subsidiary, Calfax Racing Association; and (2) the subsidiary's 1980 horse race association license and its application for a 1981 license.

In granting the motion, the trial court reasoned horse racing is a public concern.

"It follows, then, that a racing association licensed by the state to conduct a meet carries out a public function when it does so, and that the plaintiff, as the president, a director, and a significant shareholder in a licensee (Equestra), was a 'public official' with respect to the association's activities pursuant to its license. Surely he was no less a public official than the person hired by the county to manage the ski area involved in *Rosenblatt*. [*Rosenblatt* v. *Baer* (1966) 383 U.S. 75 (15 L.Ed.2d 597, 86 S.Ct. 669).] . . . .

". . . . . . . . . . . . . . . . . . . . .

"Moreover, because candidates for public office fall within the purview of *Rosenblatt* no less than those who actually occupy 'public offices,' [*Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 36 (81 Cal.Rptr. 360, 459 P.2d 912); *St. Amant* v. *Thompson* (1968) 390 U.S. 727 (20 L.Ed.2d 262, 88 S.Ct. 1323)], the defendants' motion must also be granted with respect to plaintiff's position as president, a director and a significant shareholder of the corporation that applied for a license to conduct the 1981 spring meet."

Defendants then sought summary judgment on the theory they did not know any statement in the articles was false nor did they entertain any doubt that any such statement was true. Again the trial court agreed with defendants by finding: "[T]he evidence submitted by the plaintiff in opposition to the motion is 'of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence' (*Anderson*, at p. 215 [*Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242 (91 L.Ed.2d 202, 106 S.Ct. 2505)])." Plaintiff appealed.

DISCUSSION

BACKGROUND

In *New York Times* v. *Sullivan, supra,* 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707], the United States Supreme Court held a public official was not entitled to damages for defamation relating to his or her public office unless the official could prove the statement was made with "actual malice," that is, with knowledge of its falsity or with reckless disregard of whether it was true or false. The court had no occasion in *New York Times* to determine how far down into the lower rank of government employees the "public official" designation would extend or to specify categories of persons who would or would not be included. The respondent was an elected city commissioner and there was no question but that he was a "public official." (*Id.* at p. 283, fn. 23 [11 L.Ed.2d at p. 708].)

Subsequently, a plurality in *Rosenblatt v. Baer* (1966) 383 U.S. 75, 85-86 [15 L.Ed.2d 597, 605-606, 86 S.Ct. 669], suggested the "public official" designation applied "at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

". . . Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply." (383 U.S. at pp. 85-86 [15 L.Ed.2d at pp. 605-606], fns. omitted.)

The *New York Times* privilege has since been extended to publishers of allegedly defamatory falsehood concerning "public figures." ██ "Public figures" are those who command sufficient continuing public interest by their position or their purposeful activity amounting to a thrusting of their personality into the "vortex" of an important public controversy *and* have a realistic opportunity to counteract false statements. (*Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 154-155 [18 L.Ed.2d 1094, 1110-1111, 87 S.Ct. 1975].)

## I.   "PUBLIC OFFICIAL"[1]

### A.   *Plaintiff's Argument.*

██   In his opening brief, plaintiff argued there was a triable issue of fact regarding whether he was a *"public official for all purposes."* (Italics added.) There is no such legal concept. Plaintiff has confused the term "public official" with "public figure." The law recognizes a distinction between "public figures" who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes" (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 345 [41 L.Ed.2d 789, 808, 94 S.Ct. 2997]), and those who are "public figures" in the limited sense that they have voluntarily injected themselves into the resolution of particular public controversies or attempted to influence public opinion regarding a cause. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254 [208

---

[1] This court requested supplemental briefing concerning whether defendants could obtain summary relief on the theory plaintiff was a "public official and candidate for public office" when defendants pled as an affirmative defense plaintiff was a "public figure," but did not plead he was a "public official" or candidate for public office. Plaintiff conceded this question at oral argument, asking us to decide his appeal on the substantive issues rather than a procedural point. Accordingly, we do not address whether defendants could obtain summary relief on a theory not pled.

Cal.Rptr. 137, 690 P.2d 610].) Thus, the "public figure for all purposes" and the "limited public figure" labels exist in the case law. However, defendants here sought and obtained summary adjudication solely on grounds plaintiff was a "public official and candidate for public office." The "public figure" cases are accordingly irrelevant to these circumstances, as is plaintiff's claim that he was not a "public official for all purposes."

Plaintiff also argues a horse racing board licensee is not a "public official." He observes there are no cases which explicitly hold a governmental licensee is necessarily a "public official." Given that observation, he relies upon *Franklin* v. *Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915 [159 Cal.Rptr. 131].

The *Franklin* court held, in relevant part, a school teacher was not a "public official." (97 Cal.App.3d pp. 924-925.) While a public high school teacher might occupy a position inviting public scrutiny and discussion, the *Franklin* court reasoned: "Implicit in the reasoning of *New York Times* and of *Rosenblatt* is the concept of a freedom of the *governed* to question the *governor,* of those who are influenced by the operation of government to criticize those who *control* the conduct of government. The governance or control which a public classroom teacher might be said to exercise over the conduct of government is at most remote and philosophical: Far too much so, in our view, to justify exposing each public classroom teacher to a qualifiedly privileged assault upon his or her reputation. In *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, the Supreme Court points out that extension of the qualified constitutional privilege to those who comment upon public officials is to be rationalized in part by the consideration that 'An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs.' (418 U.S. at p. 344 [41 L.Ed.2d at p. 808].) We are unwilling to hold that a school teacher must be deemed to have assumed the risk of nonmalicious defamation. We perceive in such a rule a real and intolerable danger to the freedom of intellect and of expression which the teacher must have to teach effectively." (*Franklin, supra,* 97 Cal.App.3d at p. 924.)

A public school teacher is by virtue of his or her teaching credential a governmental licensee. However, the *Franklin* court's refusal to find a "public official" status did not depend on the teacher's license.

### B. *Who Is a "Public Official"?*

To determine, as a matter of law, whether plaintiff was a public official at the time the articles were published, it is necessary to first define the term "public official." As previously noted, the Supreme Court in *New York*

*Times* v. *Sullivan, supra,* 376 U.S. at page 283, footnote 23 [11 L.Ed.2d at p. 708], did not define the term; the plaintiff was an elected city commissioner, a position which "clearly made him a public official." The court analogized plaintiff to a judge and noted criticism of a judge or the judge's decision may not be repressed except where there is a clear and present danger of obstruction of justice.

"If judges are to be treated as 'men of fortitude, able to thrive in a hardy climate,' [citation] surely the same must be true of other government officials, such as elected city commissioners." (376 U.S. at p. 273 [11 L.Ed.2d at p. 702], fn. omitted.)

Since *New York Times,* the Supreme Court has had little to say regarding who is a public official. In *Rosenblatt* v. *Baer, supra,* 383 U.S. 75, a former supervisor of a county-owned and county-operated recreation area filed a libel action based on a newspaper column which he claimed criticized his job performance. In an appeal following an award of damages, he urged two theories to support his recovery. First, the jury could award him damages if it found the column cast suspicion indiscriminately on the recreation area's former management group, regardless of whether the jury found the alleged misconduct concerned him. (*Id.* at pp. 79-80 [15 L.Ed.2d at pp. 601-602].) A majority of the court disagreed with this theory and reversed the judgment. The court observed such a theory was tantamount to a demand for recovery based on libel of government and thus constitutionally insufficient. (*Id.* at p. 83 [15 L.Ed.2d at p. 604].)

Alternatively, the plaintiff argued that people who read the column would believe it referred specifically to him as the "man in charge" at the area, personally responsible for its financial affairs. By his argument, however, the plaintiff unwittingly raised the question of whether he was a "public official" and should have to show malice under the *New York Times* standard. (383 U.S. at p. 83 [15 L.Ed.2d at p. 604].) *New York Times* had not been decided when the plaintiff in *Rosenblatt* went to trial.

Justice Brennan, writing for a plurality on this issue, acknowledged there was no occasion in *New York Times* to specify categories of persons who would or would not be included in the "public official" designation. He went on to describe the motivating forces behind the *New York Times* decision: "There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore,

that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." (*Rosenblatt, supra,* 383 U.S. 75 at p. 85 [15 L.Ed.2d at p. 605], fn. omitted.)

In a concurring opinion, Justice Douglas took exception to Justice Brennan's approach: "[I]f free discussion of public issues is the guide, I see no way to draw lines that exclude the night watchman, the file clerk, the typist, or, for that matter, anyone on the public payroll. And how about those who contract to carry out governmental missions? Some of them are as much in the public domain as any so-called officeholder. And how about the dollar-a-year man, whose prototype was publicized in *United States* v. *Mississippi Valley Generating Co.* [1961] 364 U.S. 520 [5 L.Ed.2d 268, 81 S.Ct. 294]? And the industrialists who raise the price of a basic commodity? Are not steel and aluminum in the public domain? And the labor leader who combines trade unionism with bribery and racketeering?" (*Rosenblatt, supra,* at pp. 89-90 [15 L.Ed.2d at p. 607], fn. omitted (conc. opn. of Douglas, J.).) Justice Brennan responded: "Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply.[13]" (*Id.* at pp. 86-87 [15 L.Ed.2d at p. 606], fn. 12 omitted.) Footnote 13 provides: "It is suggested that this test might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." (*Ibid.*) To this spirited debate, Justice Black, with whom Justice Douglas joined, added his own thoughts: "And the right to criticize a public agent engaged in public activities cannot safely, and should not, depend upon whether or not that agent is arbitrarily labeled a 'public official.' Nor should the right to criticize depend upon how high a position in government a public agent may occupy. Indeed a large percentage of public moneys expended is distributed by local agents handling local funds as the respondent in this case did. To be faithful to the First Amendment's guarantees, this Court should free private critics of public agents from fear of libel judgments for money just as it has freed critics from fear of pains and penalties inflicted by

government." (*Id*. at p. 95 [15 L.Ed.2d at pp. 610-611] (conc. and dis. opn. of Black, J.).)

Later, the Supreme Court in *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at page 344 [41 L.Ed.2d at pp. 807-808], expanded its rationale for the *New York Times* rule in the course of holding the rule does not apply where the person defamed is a private individual. In so doing, the court added this insight to the "public official" designation: "The first remedy of any victim of defamation is selfhelp—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. . . . [¶] More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case."

Beyond *Rosenblatt* and *Gertz,* state and lower federal courts have been left to grapple with the parameters of "public official." Generally, these courts have applied the reasonings of Justices Douglas and Black in *Rosenblatt*. Taking a very broad approach, many sister state courts have affixed the "public official" label to all kinds of persons who have some affiliation with government. (For a recital of such cases, see Annot., Libel and Slander: Who Is a Public Official or Otherwise Within the Federal Constitutional Rule Requiring Public Officials to Show Actual Malice (1968) 19 A.L.R.3d 1361, § 5(c), pp. 1373-1375; *id.* (1987 pocket supp.) pp. 136-142.) As one observer has noted, the caveat in footnote 13 of Justice Brennan's opinion in *Rosenblatt,* that the government employee's position must invite public scrutiny, either has not been discerned or has been disregarded by lower courts. (Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytic Primer* (1975) 61 Va.L.Rev. 1349, 1376-1378.)

Notably, there are few California decisions which have considered who is a "public official" for purposes of the *New York Times* rule. Those courts have nevertheless consistently applied Justice Brennan's analysis in *Rosenblatt, supra,* 38 U.S. at pages 85-86 [15 L.Ed.2d at pp. 605-606], to "persons who are in a position significantly to influence the resolution of [public] issues," "to those among the hierarchy of governmental employees who have, or appear to the public to have, substantial responsibility for or con-

trol over the conduct of governmental affairs," and "[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." (*Gomes* v. *Fried* (1982) 136 Cal.App.3d 924, 932 [186 Cal.Rptr. 605]; *Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 138 [162 Cal.Rptr. 701]; *Franklin* v. *Benevolent etc. Order of Elks, supra,* 97 Cal.App.3d at pp. 923-924; *Tague* v. *Citizens for Law & Order, Inc.* (1977) 75 Cal.App.3d Supp. 16, 21-24 [142 Cal.Rptr. 689]; *Peoples* v. *Tautfest* (1969) 274 Cal.App.2d 630, 635-636 [79 Cal.Rptr. 478].)

Defendants nonetheless urge a more expansive approach to the question of who is a public official, and offer two different bases for the "public official" designation. One requires only a brief discussion. The other requires some analysis. First, defendants argue California common law broadly defines "public official." The bulk of the cases cited for this proposition predate *New York Times,* or do not pertain to the *New York Times* defense. ■ Moreover, whether plaintiff was a "public official" may not be decided by reference to state law standards. (*Rosenblatt* v. *Baer, supra,* 38 U.S. at p. 84 [15 L.Ed.2d at pp. 604-605].)

Second, defendants attempt to achieve the best of both worlds in their reliance on *Rosenblatt.* They quote the language from Justice Brennan's opinion regarding those who are in a position significantly to influence a resolution of public issues. Yet, they urge a definition of "public official" to include those who contract to carry out governmental missions (citing Justice Douglas's concurring opinion) and other agents responsible for distributing public funds (citing Justice Black's concurring and dissenting opinion). Thus, if a person performs a delegated public or governmental function, then, according to defendants, he or she is a "public official."

The positions of each of the *Rosenblatt* justices on the issue of "public official" are persuasive. Yet, they are not binding precedent; none of them represent the sentiments of a majority of the court. Further, the discussions pertaining to "public official" are dicta since the court reversed the judgment on other grounds. Thus, we are theoretically free to choose any of the positions espoused in *Rosenblatt.* However, to adopt either Justice Douglas's or Justice Black's approach to "public official" would be an exercise in intellectual overreaching in light of the *New York Times* rule. The "public official" designation should not apply to an individual merely because he or she performs a public or governmental function.

The Court in *New York Times* created a privilege to defame a "public official" so long as such defamatory remarks were not made with actual

malice. The motivating force behind the rule was to permit wide-open debate on public issues which might include sharp attacks on government and public officials. (*New York Times, supra,* 376 U.S. at p. 270 [11 L.Ed.2d at pp. 700-701].) Yet, as the majority in *Gertz* later explained, the *New York Times* rule has its limits. The court perceived "public officials" as usually enjoying significantly greater access to the media. Furthermore, an individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He or she runs the risk of closer public scrutiny than might otherwise be the case. (*Gertz, supra,* 418 U.S. at p. 344 [41 L.Ed.2d at pp. 807-808].)

In light of these considerations, we find the views expressed by Justice Brennan in *Rosenblatt* most accurately reflect the position of the U.S. Supreme Court on the matter of who is a "public official" for purposes of the *New York Times* rule. As an aside, this result is consistent with the fact Justices Douglas and Black in *Rosenblatt* reiterated the position they had previously taken in *New York Times.* (*Rosenblatt, supra,* 383 U.S. at p. 95 [15 L.Ed.2d at pp. 610-611] (conc. and dis. opn. of Black, J., joined by Douglas, J.).) In his concurring opinion in *New York Times,* Justice Black wrote: "I base my vote to reverse on the belief that the First and Fourteenth Amendments not merely 'delimit' a State's power to award damages to 'public officials against critics of their official conduct' but completely prohibit a State from exercising such a power. The Court goes on to hold that a State can subject such critics to damages if 'actual malice' can be proved against them. 'Malice,' even as defined by the Court, is an elusive, abstract concept, hard to prove and hard to disprove. The requirement that malice be proved provides at best an evanescent protection for the right critically to discuss public affairs and certainly does not measure up to the sturdy safeguard embodied in the First Amendment. Unlike the Court, therefore, I vote to reverse exclusively on the ground that the Times and the individual defendants had an absolute, unconditional constitutional right to publish in the Times advertisement their criticisms of the Montgomery agencies and officials." (*New York Times, supra,* 376 U.S. 254, 293 [11 L.Ed.2d 686, 716] (conc. opn. of Black, J., joined by Douglas, J.).) Thus, it would be unreasonable to apply either Justice Douglas's or Justice Black's approach, as a definition of "public official," since these approaches reflect those justices' abiding opposition to the *New York Times* rule.

▪ We conclude the Supreme Court's vision of a "public official" is someone in the government's employ who: (1) has, or appears to the public to have, substantial responsibility for or control over the conduct of governmental affairs; (2) usually enjoys significantly greater access to the mass media and therefore a more realistic opportunity to contradict false statements than the private individual; (3) holds a position in government which

has such apparent importance that the public has an independent interest in the person's qualifications and performance beyond the general public interest in the qualifications and performance of all government employees; and (4) holds a position which invites public scrutiny and discussion of the person holding it entirely apart from the scrutiny and discussion occasioned by the particular controversy.

### C. *Was Plaintiff a "Public Official"?*

■ Following the analysis offered by Justice Brennan in *Rosenblatt* and the limitations spelled out in *Gertz,* the next question is whether plaintiff at the time of the defendants' publications was a "public official." The answer must be "no." It is undisputed that plaintiff was not a government employee. Thus, the condition precedent for "public official"—someone in the government's employ—is lacking.

It should be noted defendants urge Justice Brennan would find plaintiff was a "public official" because of an inference in the *Rosenblatt* plurality opinion that the plaintiff in that case, supervisor of a county-owned and operated recreation area, was deemed a public official. Defendants misunderstand *Rosenblatt*. First, the plaintiff in *Rosenblatt* was a government employee, an important distinction missing in this case. Further, the plaintiff had characterized his role in management of the area as so prominent and important that he raised a substantial argument regarding whether he was a "public official." Still, the record left open the possibility that he could bring his claim outside the *New York Times* rule. (*Rosenblatt, supra,* 383 U.S. at p. 87 [15 L.Ed.2d at p. 606].)

In the present case, defendants' primary argument for plaintiff's "public official" status is, however, based on a broad interpretation of "public official": one who performs a government function. This interpretation is consistent with Justices Douglas and Black's opinions in *Rosenblatt* and the approach taken in many sister state jurisdictions. In their summary adjudication motion, defendants here argued plaintiff was a public official and candidate for public office by virtue of (1) his interest in Equestra Corporation and its subsidiary, Calfax Racing Association, and (2) the subsidiary's 1980 horse race association license issued by the CHRB, and the subsequent application for a 1981 license. They claim the CHRB, by licensing Calfax, delegated to the association the functions of: controlling gambling, protecting the public from organized crime, and controlling and influencing the generation and collection of public revenue.

Defendants' position is faulty. Not only do they rely on an overbroad definition of "public official," their argument is based on other inaccurate assumptions.

First, *assuming* a horse racing association could be a "public official" by virtue of its license, that circumstance would not make plaintiff a "public official." Plaintiff's interest in the racing association was not as a sole proprietor. Rather, he was a 33⅓ percent shareholder and a director of the corporation whose subsidiary possessed the license. Undaunted, defendants argue plaintiff was a "public official" because he was the "main player" in the corporation. However, one's importance to a corporate enterprise is not the test for piercing the corporate veil and, in this case, treating plaintiff as the licensee. (See 6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 5 et seq., pp. 4317-4328.) Further, disregard of the corporate entity was not an issue in the summary adjudication motion.

Defendants also argue plaintiff was a "public official" because he was, by his own admission in his opposition to the summary adjudication motion, licensed as the general manager of the 1980 racing meet. However, the statutory and regulatory authorities which they cite as establishing a delegation of governmental function are provisions which deal with the responsibilities of a horse racing association, not a general manager of a horse race meet. (See Bus. & Prof. Code, § 19610 et seq.; Cal. Code Regs., tit. 4, §§ 1433, 1436, 1445-1462, 1467, 1870, 1920, 1981.)

Further, inherent in defendants' argument is the notion that horse racing with on-track wagering is a governmental business or function. According to defendants, the government "deputizes" horse racing associations, the general manager and others through the licensing process, to perform the government's function and duties.

Yet, the fact that government requires a license to perform a job and regulates the performance of the job does not make the job a government function. For example, our state government requires attorneys to be licensed in order to practice law. That license reflects certain minimum standards of performance and obligates the licensee to perform within those standards and consistent with a code of professional responsibility. However, that does not necessarily make lawyering a governmental function or a lawyer a "public official."

Horse racing with on-track wagering is a private enterprise. Certainly it is a heavily regulated business in California (see Bus. & Prof. Code, § 19400 et seq.; Cal. Code Regs., tit. 4, § 1400 et seq.) given the state's concern over illegal gambling (see, e.g., Bus. & Prof. Code, §§ 19401 & 19610 et seq.). Nevertheless, these regulations, including those concerning licensing requirements and fees, do not make horse racing in California a government business. Instead, the regulations are the means by which the state government protects the public from illegal gambling and the prospects of orga-

nized crime. Finally, the fact that the public is concerned about illegal gambling and the prospects of organized crime does not render either Calfax Racing Association or plaintiff a "public official" as that concept is applied in defamation actions.

Accordingly, we hold as a matter of law plaintiff was not a "public official."

Defendants suggest this court should continue its analysis and find plaintiff was nevertheless a "public figure" as a matter of law. This we may not do, however, based on the record before us. Defendants chose their own course to establish the *New York Times* defense when they sought to prove plaintiff was a "public official." They could have attempted to establish the "public figure" designation as an undisputed fact. Having selected their course, defendants produced a very limited statement of undisputed facts, namely, plaintiff's interest in Calfax and Calfax's 1980 horse race association license and application for a 1981 license. Those facts do not support a "public figure" determination as a matter of law.

By suggesting we could find plaintiff was a "public figure," defendants attempt to minimalize the distinction between a "public official" and a "public figure" as a minor legal technicality. Their zealous advocacy, however, blurs their vision. The distinction between "public official" and "public figure" is not a trivial one.

Lest defendants should forget, plaintiff is entitled to pursue his defamation action as an ordinary citizen against defendants, unless defendants can prove plaintiff's conduct moved him outside the protected privacy of the ordinary person.

To establish the "public figure" designation as a matter of law, defendants must show, with undisputed evidence, plaintiff either occupied a position of persuasive power and influence, voluntarily injected himself into the resolution of a particular public controversy, or attempted to influence public opinion regarding a cause. Defendants have not produced such evidence. However, our holding that plaintiff is not a "public official" as a matter of law is made without prejudice to defendants seeking summary relief in the trial court on the "public figure" issue.

II. ACTUAL MALICE *

* See footnote, *ante,* page 597.

## III. DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with the views expressed herein. Costs of appeal are awarded to plaintiff/appellant.

Franson, P. J., and Ardaiz, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 1, 1989.