Michael TRUE

v.

Richard S. LADNER, et al.

Supreme Judicial Court of Maine.

Argued June 12, 1986.
Decided July 22, 1986.

Zuckerman and Avaunt, Mary B. Devine (orally), Lawrence J. Zuckerman, Gray, for plaintiff.

Norman & Hanson, Peter J. DeTroy, (orally), Jonathan W. Brogan, Portland, for defendants.

Before McKUSICK, C.J., and NICHOLS, ROBERTS and GLASSMAN, JJ.

GLASSMAN, Justice.

In this slander action the defendants, Richard S. Ladner, Superintendent of School Union 30, and Ladner's superior, the Lisbon School Committee, appeal from the judgment of the Superior Court, Androscoggin County, entered on a jury verdict in favor of the plaintiff, Michael True. On appeal, the defendants contend that the trial court erred in ruling that 1) Ladner was not immune from suit pursuant to the personal immunity for discretionary functions under 14 M.R.S.A. § 8111(1)(C) (1980); 2) statements made by Ladner were not absolutely protected as expressions of opinion; and 3) True was not a "public official" and therefore was not required to prove his allegations by clear and convincing evidence. The defendants also challenge the sufficiency of the evidence to support the jury's verdict. For reasons hereinafter set forth, we affirm the judgment.

I. *Statement of Facts*

From 1975 to 1979 True taught mathematics at Lisbon High School. A newly employed teacher within the Lisbon school system is on probationary status for two years. *See* 20-A M.R.S.A. § 13201 (Supp. 1985-1986). Keith Cunningham, principal of the high school, made written evaluations of True during the probationary period pursuant to a policy of the school system requiring three formal evaluations a year during that period. The evaluations indicated, *inter alia*, that True explained

the subject matter in a clear, explicit and careful manner, that his classroom appeared to be one "in which learning is taking place," and that the students "were very attentive and working very seriously." In addition, two of the evaluations indicated the students were not working up to their capacity, and in one evaluation Cunningham raised a question as to why True employed a particular teaching technique.

At trial Cunningham testified that True's "abilities as a classroom teacher" were "quite satisfactory," and that while True took "some time" to adjust to teaching "lower ability students," he eventually adjusted "relatively well." During the probationary period Cunningham had no concerns that would have led him to oppose True's continued employment as a teacher in the high school, and could not recall superintendent Ladner ever having voiced such a concern.

Carol Bradford, a guidance counselor at Lisbon High School, testified that she had never received "negative feedback about Michael True from any students or parents" and had received as much positive feedback concerning him as she had received concerning "any other good teacher." Pauline Higgins, a teacher at Lisbon High School, testified that True's teaching had inspired her daughter Trudy to concentrate on mathematics in college and to become a mathematics teacher.

Evidence was presented at trial as to True's participation in various activities within the high school and the Lisbon school system. While the standard teaching load consisted of five courses, during each of two years True taught six courses. He taught at least one of these additional courses during a free period. True served as a class adviser; participated in a preventive mental health program; took personal days to visit computer companies to inquire about computers for instructional use; advised the "math team" for four years, during two of which he received additional compensation; personally provided transportation for the math team because the

school system did not; and participated in a study of the mathematics curriculum for grades kindergarten through eight, for which he did not receive additional compensation. At the conclusion of this study Ladner sent True a letter praising him for having served "untiringly and professionally" on the committee and predicting significant improvement in the mathematics curriculum as a result of the committee's work. In addition, True served on accreditation teams that evaluated two other school systems within the state.

Superintendent Ladner had never observed True in the classroom and never received "negative references" from anyone concerning True's teaching except for any negative indications that might have been contained in Cunningham's written evaluations. In his position as superintendent Ladner received a copy of each evaluation of a probationary teacher and reviewed it before having it placed in the teacher's personnel file. After True's probationary period Ladner did not review Cunningham's evaluations of True. Ladner testified at trial that he had reservations and concerns about True's teaching in every year that True taught at Lisbon High School, but had taken no action to prevent True's being rehired each year.

True was given a renewal contract for the 1979–80 school year, but resigned in the summer of 1979. In his letter of resignation True cited as the "final impetus" for his decision to resign the school committee's elimination of a position held by another teacher. True characterized the elimination of this position "as an open reprisal for speaking out on issues," and further stated that he could not "justify teaching within a system where academic freedom ... is not acceptable."

In August 1981, True applied for a position as a mathematics teacher at Maranacook High School in School Union 42. David Shapiro, team leader of the mathematics and science department at Maranacook, engaged in a preliminary screening of applicants and then convened a screening

committee. The committee interviewed four applicants and reached a consensus that True was the strongest candidate for the position. On September 11, 1981, Shapiro informed his superior, Millard Harrison, Superintendent of School Union 42, of the committee's recommendation. While Harrison as superintendent had sole authority to nominate to the school committee a candidate for the position,[1] he had in the past generally followed the screening committee's recommendation. Harrison decided to contact Ladner, the superintendent of the Lisbon school system. In the course of the ensuing telephone conversation Ladner told Harrison: 1) True was a good mathematician, but not a good mathematics teacher; 2) True was "more concerned with living up to the terms of his contract rather than going the extra mile"; and 3) Ladner "did not feel [True] turned the students on." Ladner volunteered the name of True's former student, Trudy Higgins, for the position at Maranacook. Immediately after this telephone conversation, Harrison told Shapiro that he would not nominate True for the position.

The jury found by a preponderance of the evidence that Ladner made the statements with knowledge of their falsity or with reckless disregard of their truth or falsity and returned a verdict for True. This appeal ensued.

## II. *Personal Immunity for Discretionary Functions*

The defendants contend that in responding to Harrison's request for an evaluation of True, Ladner was performing a "discretionary function or duty" within the meaning of 14 M.R.S.A. § 8111(1)(C) (1980) and therefore is personally immune from suit. Because we hold that Ladner was not performing a "function or duty" within the meaning of the statute, we do not reach the question whether discretion was involved.

The Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 (1980 & Supp.1985–1986), provides for a general immunity of "all governmental entities"[2] from suit. § 8103(1). This immunity explicitly includes:

> The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not *the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed* is valid or invalid.

§ 8103(2)(C) (emphasis added). Section 8111 provides a corresponding personal immunity for employees of governmental entities in specified instances including:

> The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused; and whether or not *the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed* is valid.

§ 8111(1)(C) (emphasis added).

The necessary implication of these companion sections is that an employee of a governmental entity enjoys a personal immunity from civil liability for his performance of, or failure to perform, a discretionary function or duty only when a "statute, charter, ordinance, order, resolution, regulation or resolve" authorizes the performance of the discretionary function or duty and when the defendant has acted, or has failed to act, pursuant to that authorization. *Cf. MacKerron v. Madura*, 445 A.2d 680, 682 (Me.1982) (improper to dismiss complaint when it is not discernible "whether the actions alleged were functions or duties of [the employee] and if they were, whether they were discretionary"). This conclusion is reinforced by an examination of the language of sections

---

**1.** *See* 20–A M.R.S.A. § 13201 (Supp.1985–1986).

**2.** A "governmental entity" includes the State and political subdivisions. § 8102(2). A "political subdivision" includes, *inter alia*, any city, town, or school district. *Id.* (3).

8103(2)(A) and 8111(1)(A). These sections provide immunity for governmental entities and employees of such entities, respectively, for undertaking or failing to undertake "any legislative or quasi-legislative act." §§ 8103(2)(A), 8111(1)(A). The two sections characterize a legislative or quasi-legislative act as "including, but not limited to, the adoption or failure to adopt any statute, charter, ordinance, order, regulation, resolution or resolve." *Id.* Thus the legislative immunity provisions characterize a legislative or quasi-legislative act in terminology identical to that of the discretionary function immunity provisions. We conclude therefore that the authority for the performance of a discretionary function or duty must arise from the legislative or quasi-legislative enactments listed in the discretionary function immunity provisions.

■ In the instant case the defendants point to statutory provisions delineating the recruiting and supervisory duties of the school superintendent. "The superintendent shall nominate all teachers" subject to regulations governing salaries and qualifications made by the school board. 20–A M.R.S.A. § 13201 (Supp.1985–1986). When the school board approves the nominations, "the superintendent may employ teachers so nominated and approved." *Id.* The superintendent has the duty to direct and supervise the work of teachers within the school system. 20–A M.R.S.A. § 1055(10) (1983).

Here there is no basis to find that Ladner was acting pursuant to these statutory duties. When Ladner made the statements in question, True was not teaching under the supervision of Ladner, nor was Ladner engaged in determining whether to nominate True for a position within School Union 30. On the contrary, Ladner's statements concerned a person who had not been employed within School Union 30 for two years and who was seeking employment elsewhere. The defendants have not pointed to, nor has our research disclosed, any other enactments that might authorize the function or duty of Ladner to respond to a prospective employer's request for an evaluation of an applicant for a teaching position. We hold therefore that in responding to Harrison's request for an evaluation, Ladner was not engaged in a "function or duty" within the meaning of 14 M.R.S.A. § 8111(1)(C).[3]

### III. *Opinion or Fact*

The defendants contend that Ladner's statements constituted expressions of opinion that are absolutely protected under the first amendment to the United States Constitution. We disagree.

■ An essential element of slander is that the statement in question must contain a false statement of fact. *See Caron v. Bangor Publishing Co.,* 470 A.2d 782, 784 (Me.1984); *Restatement (Second) of Torts,* § 566 & comment c (1976). This requirement has its roots in the protection afforded the expression of ideas by the first amendment.[4] *Caron,* 470 A.2d at 784; *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974). Thus, if Ladner's statements

---

3. In view of our disposition of this issue we do not reach the question, urged on us by the plaintiff and defendants, whether "discretion" within the meaning of the common law or statutory immunity for discretionary functions is involved. *See MacKerron v. Madura,* 474 A.2d 166, 167 (Me.1984).

4. U.S. Const.Amend. I provides in pertinent part: Congress shall make no law ... abridging the freedom of speech, or of the press....

The first amendment is made applicable to the states through the due process clause of the fourteenth amendment. *See, e.g., Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903,

84 L.Ed. 1213 (1940); *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925).

The Declaration of Rights of the Maine Constitution also affords protection to the expression of ideas. Me.Const. art. I, § 4, provides in pertinent part:

Every citizen may freely speak, write and publish his sentiments on any subject, being responsible for the abuse of this liberty.

We have no occasion in the instant case to define the scope of the state constitutional guarantee.

constitute expressions of opinion, they are not actionable.

The determination whether an allegedly defamatory statement is a statement of fact or opinion is a question of law. If the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the jury.

*Caron*, 470 A.2d at 784 (citations omitted).

■ A statement ostensibly in the form of an opinion is actionable if it implies the allegation of undisclosed defamatory facts as the basis of the opinion. *Id.* If the statement given in the form of an opinion cannot reasonably be understood as implying undisclosed defamatory facts, it is not actionable. If the statement could reasonably be understood by the ordinary person as implying undisclosed defamatory facts, the question of whether it is a statement of fact or an opinion will be submitted to the jury. *See id.* at 785. *See also Restatement (Second) of Torts* § 566 comment c at 173.

■ Here the statements made by Ladner, although arguably in the form of opinions, imply undisclosed defamatory facts. For example, the statement that True is not a good mathematics teacher implies that Ladner had personally evaluated True's teaching and found it wanting or that evaluations made by others were unfavorable and Ladner had received these unfavorable evaluations. The statement that True was "more concerned with living up to the terms of his contract rather than going the extra mile" implies a lack of involvement in extracurricular activities, a failure to give assistance to students outside of the classroom, and a failure to assume other responsibilities not mandated by the contract. The statement that Ladner "did not feel [True] turned the students on" implies a low level of performance by the students and a lack of initiative on their part either in mathematics-related programs at the high school or in pursuing

mathematics as a field of study beyond high school.

Thus the jury could properly find that Ladner's statements were statements of fact. This finding is supported by the evidence and will not be disturbed on appeal. *Cf. Saunders v. VanPelt*, 497 A.2d 1121, 1125 (Me.1985).

## IV. *"Public Official" Status and the Standard of Proof*

■ The defendants next contend that the trial court erred in ruling that True was not a "public official" within the meaning of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and therefore was not required to prove his allegations with "convincing clarity." We disagree.

The first amendment as applied to the states through the fourteenth amendment [5] requires that a "public official" who brings a defamation suit against critics of his "official conduct" prove "actual malice," that is, that the defendants made the statements with knowledge of their falsity or with reckless disregard of whether they were true or false. *New York Times*, 376 U.S. at 279–83, 84 S.Ct. at 725–27; *see also Michaud v. Town of Livermore Falls*, 381 A.2d 1110, 1113 (Me.1978). This proof must be by "convincing clarity." *New York Times*, 376 U.S. at 285–86, 84 S.Ct. at 728–29; *Michaud*, 381 A.2d at 114–15. *See also Restatement (Second) of Torts* § 580A comment f (1976) (equating proof by "convincing clarity" with proof by clear and convincing evidence).

In the instant case the court instructed the jury that because Ladner had a conditional privilege to make statements evaluating a teacher formerly employed by the school system of which Ladner was superintendent, True must prove that Ladner abused his privilege by having made the statements with knowledge of their falsity or with reckless disregard of their truth or falsity. Thus the instructions satisfied the "actual malice" requirement of *New York*

5. *See* n. 4 *supra*.

*Times,* but the instruction that True must prove his allegations by a preponderance of the evidence did not satisfy the convincing clarity requirement. Therefore, if True is a "public official," the judgment must be vacated.

*New York Times* did not decide how far down the administrative ladder the designation of "public official" extends. *See* 376 U.S. at 283 n. 23, 84 S.Ct. at 727 n. 23. In *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), the Supreme Court established criteria for the determination of whether a particular public employee is a "public official." The Court noted that *New York Times* rested on two important interests: "a strong interest in debate on public issues" and "a strong interest in debate about those persons *who are in a position significantly to influence the resolution of those issues." Id.* at 85, 86 S.Ct. at 675 (emphasis added). The Court then delineated the status of "public official" in the following terms:

> Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized. It is clear, therefore, that the "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.
>
> ... Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of a person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements were identified in *New York Times* are present and the *New York Times* malice standards apply.

*Id.* at 85–86, 86 S.Ct. at 675–76 (footnotes omitted).

The test for "public official" status then is whether the public has an "independent interest in the qualifications and performance of the person" holding the office beyond the interest in the qualifications and performance of all government employees, *see id.* at 86, 86 S.Ct. at 676, and this "independent interest" may be found "at the very least" when an employee has "substantial responsibility for or control over the conduct of governmental affairs," *see id.* at 85, 86 S.Ct. at 675. More recently, the Supreme Court has noted that the status of "public official" "cannot be thought to include all public employees." *Hutchinson v. Proxmire,* 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 2680 n. 8, 61 L.Ed.2d 411 (1979).[6]

We turn then to the question whether a public school teacher is a "public official" within the meaning of *New York Times.* The principal rationale for the *New York Times* rule is the freedom of the governed to criticize the government and those responsible for its operations. *See Rosenblatt,* 383 U.S. at 85, 86 S.Ct. at 675. "The governance or control which a public classroom teacher might be said to exercise over

---

**6.** This statement was not essential to the decision in *Hutchinson,* which involved the question of whether the plaintiff—a director of research at a state mental hospital, adjunct professor at a state university, and the recipient of a federal grant of some half a million dollars—was a "public figure." *See* 443 U.S. at 114–15, 119–22, 99 S.Ct. at 2677–78, 2680–81. The Supreme Court has characterized the status of a "public figure" in the following terms:

> For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that

they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.* at 134, 99 S.Ct. at 2687, quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974). The Court concluded that the plaintiff was not a "public figure." 443 U.S. at 134–36, 99 S.Ct. at 2687–2688.

the conduct of government is at most remote and philosophical." *Franklin v. Lodge 1108, Benevolent & Protective Order of Elks,* 97 Cal.App.3d 915, 159 Cal. Rptr. 131, 136 (1979); *see also McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 916, 425 N.E.2d 1130, 1133 (1981). On the facts of *Roche v. Egan,* 433 A.2d 757 (Me. 1981), we held that a police detective was a "public official," and the complained of statements should be treated as affecting him in that capacity. In that case, we emphasized that "law enforcement is a uniquely governmental affair" and that the plaintiff was "vested with substantial responsibility for the safety and welfare of the citizenry in areas impinging most directly and intimately on daily living," a responsibility "punctuated by the fact that a firearm, no less than a badge, comes with his office." *Id.* at 762. By comparison, education is not uniquely governmental, and the authority exercised by a public school teacher is very limited. While the authority of a law enforcement officer potentially extends over all persons within the territorial jurisdiction of the law enforcement agency and to all hours of a day, the authority of a public school teacher is normally limited to school children within the school building during ordinary school hours. *Cf. Nodar v. Galbreath,* 462 So.2d 803, 808 n. 3 (Fla.1984).[7] We note that in the instant case there is no evidence True exercised substantial administrative or policymaking responsibilities or supervised substantial numbers of employees.

We find, too, that there are countervailing considerations that militate against stripping a public school teacher of the protection afforded by the common law tort of defamation. The Supreme Court noted in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) that "[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id.* at 344, 94 S.Ct. at 3009. We do not find that a public school teacher usually has this greater access. Like other private individuals, the teacher is vulnerable to injury from defamation, and the state interest in protecting the teacher is greater than the interest in protecting those with readier access to channels of communication. *See id.; see also Franklin,* 97 Cal.App.3d at 923, 159 Cal.Rptr. at 136 (application of the *New York Times* rule to a school teacher characterized as "a real and intolerable danger to the freedom of intellect and of expression which the teacher must have to teach effectively"). Moreover, we do not find any "assumption of the risk": by accepting a public teaching position without more a private individual cannot be said to "have voluntarily exposed [himself] to increased risk of injury from defamatory falsehood." *See Gertz,* 418 U.S. at 435; *see also Nodar,* 462 So.2d at 808.

We hold therefore that the trial court did not err in ruling that True was not a "public official."[8] Accordingly, there was no

---

**7.** In *Nodar* the Florida Supreme Court declined to characterize a public school teacher as a "public official." 462 So.2d at 808. The court had recently held in *Smith v. Russell,* 456 So.2d 462 (Fla.1984), that a police officer is a "public official," reasoning that a police officer "is a highly visible representative of governmental authority who has power over citizens and a broad discretion in the exercise of that power." *Id.* at 464. In *Nodar,* the court noted that "nothing in the reasoning underlying [the decision in *Smith* ] compels the conclusion that a public school teacher is a public official." 462 So.2d at 808 n. 3.

**8.** *See Franklin v. Lodge 1108, Benevolent & Protective Order of Elks,* 97 Cal.App.3d 915, 159 Cal.Rptr. 131, 136–37 (1979); *Nodar v. Galbreath,* 462 So.2d 803, 808 (Fla.1984); *McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 916, 425 N.E.2d 1130, 1133 (1981); *Poe v. San Antonio Express-News Corp.,* 590 S.W.2d 537 (Tex.Civ.App.1979). *See also Johnson v. Board of Junior College District No. 508,* 31 Ill. App.3d 270, 334 N.E.2d 442 (1975) (two professors at a public junior college held not to be "public officials," but to be "public figures" for purposes of the particular controversy); *Foote v. Sarafyan,* 432 So.2d 877 (La.App.1982) (department chairman and two other professors at

error in the court's instructions to the jury on the standard of proof.

### V. *Sufficiency of the Evidence*

■ Finally, we address the defendants' contention that there is insufficient evidence to sustain a finding that Ladner made the statements with knowledge of their falsity or with reckless disregard of their truth or falsity. We will not disturb a jury verdict that is supported by any credible evidence if the jury could rationally reach the result it did. *Inniss v. Methot Buick-Opel, Inc.*, 506 A.2d 212, 218 (Me. 1986).

■ A. *True was "more concerned with living up to the terms of his contract rather than going the extra mile."* Evidence presented at trial showed an extensive participation by True in curricular and extracurricular activities within the high school and the Lisbon school system. In a letter Ladner warmly praised True for his voluntarily assumed role in the study of the mathematics curriculum in the elementary grades. There is ample evidence to support a finding of the falsity of the statement in question and Ladner's reckless disregard of its falsity.

■ B. *True was not a good mathematics teacher, and Ladner "did not feel [True] turned the students on."* The continued employment of True at Lisbon High School until his voluntary resignation and the testimony of principal Cunningham, guidance counselor Bradford, and parent and teacher Higgins tend to establish the falsity of these statements, as do many of the specific observations in Cunningham's written evaluations. The jury could infer that Ladner acted in reckless disregard of the truth or falsity of the statements on the following facts: the continued employment of True, Ladner's recommending to Harrison that Harrison employ True's former student, the lack of any observation of True's classroom teaching by Ladner, the lack of any written evaluations after True's two-year probationary period and Ladner's apparent failure to review the evaluations at any time after his initial reading of them.

We hold therefore that on these facts there is no reason to disturb the jury's findings.

The entry is:

Judgment affirmed.

All concurring.

---

state university held not to be "public officials"), *cert. denied,* 440 So.2d 736–37 (La.1983); *Chapadeau v. Utica Observer-Dispatch,* 38 N.Y.2d 196, 341 N.E.2d 569, 379 N.Y.S.2d 61 (1975). In *Chapadeau,* the leading New York case on defamation, the plaintiff was a public school teacher. The New York Court of Appeals extensively discussed United States Supreme Court decisions on the status of a "public official," and held that as a matter of state law the arrest of a public school teacher for possession of heroin fell within "the sphere of legitimate public concern" and the plaintiff could recover if he showed by a preponderance of the evidence that the defendant acted in a "grossly irresponsible manner." *Id.* at 197–99, 341 N.E.2d at 570–71, 379 N.Y.S.2d at 63–64.

We note that courts in two jurisdictions have held public school teachers to be "public officials." *Sewell v. Brookbank,* 119 Ariz. 422, 581 P.2d 267 (Ct.App.1978); *Johnston v. Corinthian Television Corp.,* 583 P.2d 1101 (Okla.1978). Each of these decisions rested on the authority of *Basarich v. Rodeghero,* 24 Ill.App.3d 889, 321 N.E.2d 739, 742 (1974). This case held that public high school teachers were "public officials" *or* "public figures," and thus collapsed and confused the criteria for determining a plaintiff's status. Subsequent Illinois appellate cases have undermined the authority of *Basarich. See McCutcheon v. Moran,* 99 Ill.App.3d 421, 54 Ill.Dec. 913, 425 N.E.2d 1130 (1981); *Johnson v. Board of Junior College Dist. No. 508,* 31 Ill. App.3d 270, 334 N.E.2d 442 (1975). For a discussion of "public figure" status, see n. 6 *supra.*