1998 ME 176

**Melrose BEAL, et al.**

v.

**BANGOR PUBLISHING COMPANY, et al.**

Supreme Judicial Court of Maine.

Argued June 10, 1998.
Decided July 17, 1998.

Thomas R. Watson (orally), McTeague, Higbee, MacAdam, Case, Watson & Cohen, Topsham, for plaintiffs.

Bernard J. Kubetz (orally), Thad B. Zmistowski, Eaton, Peabody, Bradford & Veague, P.A., Bangor, for defendants.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA, and SAUFLEY, JJ.

RUDMAN, Justice.

[¶ 1] The Bangor Publishing Company and Paul Sylvain (collectively "Bangor Publishing") appeal from the judgment entered in the Superior Court (Washington County, *Kravchuk, C.J.*) following a jury verdict in favor of Melrose Beal and Betty Beal (collectively "Beal") on Beal's complaint against Bangor Publishing seeking damages for libel for an article published in the *Bangor Daily News.* Bangor Publishing argues on appeal that the verdict is based on insufficient evidence. We affirm the judgment.

[¶ 2] In early February, 1994, a radar gun no longer being used by the Machias Police Department was loaned to the civilian security division at the Cutler Naval Communications Center ("Cutler"). When Machias's town manager was informed that the Machias police department had loaned the radar gun, he immediately demanded its return because the town's selectmen had previously voted to offer the radar gun for sale by bid. The chief of civilian security at Cutler, Lieutenant Thomas Shea, suspected that Melrose Beal, a Machias selectman and a civilian security guard at Cutler, had informed the Machias town manager about the presence of the radar gun at Cutler. Shea engaged Beal in a heated telephone conversation concerning the fact that Beal had gone "off-base" with the fact that the radar gun was being tested for possible use by Cutler civilian security. The exchange between Beal and Shea was so severe that it prompted a complaint by Beal to Elmer Harmon, president of Beal's union's local. Harmon investigated the incident, but ultimately he and Beal decided not to file a grievance on Beal's behalf.

[¶ 3] On February 17, 1994, the *Bangor Daily News* published an article written by one of its reporters, Paul Sylvain, that concerned the two-day suspension earned by Machias's chief of police for his role in the unauthorized loan of the radar gun to Cutler. This article was followed by two articles written by Sylvain published on February 22 and 23. These two articles contain the subject matter of Beal's libel claim.

[¶ 4] The February 22 article was headlined, "Security guard at Cutler Navy base reprimanded ·in radar gun incident."[1] The article detailed how Beal had been reprimanded for "breaching national security and violating conflict of interest rules ... for going off-base with the information" concerning the presence of the radar gun at Cutler. The article also stated that as a result of the incident Beal had been assigned to a remote part of the Cutler base where contact with the general public was minimal. In fact, Beal was never officially charged with a breach of national security or a conflict of interest, and his post reassignment had been part of a general post reassignment occur-

---

1. The February 23 article was headlined, "Machias manager defends selectman in radar gun incident." The story concerned the same inci-dent as the February 22 article but the parties in this action agree that it did not contain any new defamatory statements.

ring months before the radar gun incident.[2]

[¶ 5] Beal's case was tried before a jury instructed on the law of defamation consistent with the court's determination that Beal was a public official. The jury returned a verdict in the amount of $125,000 on Melrose Beal's libel claim and no damages on Betty Beal's loss of consortium claim. This appeal followed.[3]

I.

■ [¶ 6] A public official who brings a defamation suit against critics of his official conduct must, to succeed in this action, prove that the allegedly defamatory statements were in fact false and that the statements were made with "actual malice," that is, that the statements were made with knowledge of their falsity or with reckless disregard as to whether they were true or false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 283, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see also True v. Ladner*, 513 A.2d 257, 262 (Me.1986); *Michaud v. Town of Livermore Falls*, 381 A.2d 1110, 1113 (Me.1978). Actual malice must be proved by clear and convincing evidence. *See New York Times*, 376 U.S. at 285–86, 84 S.Ct. 710; *Michaud*, 381 A.2d at 1114–15.

■ [¶ 7] The determination of whether a journalist acts with actual malice in publishing a defamatory statement involves a subjective inquiry into whether the author "entertained serious doubts as to the truth of the matter published." *Tucci v. Guy Gannett Publ'g Co.*, 464 A.2d 161, 170 (Me.1983); *see also St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). As the Supreme Court explained in *St. Amant:*

reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323.

■ [¶ 8] Rare is the instance in which a defendant journalist admits to publishing a defamatory article with either knowledge of, or reckless disregard to, the statement's falsity—this case is no exception. We thus rely on circumstantial evidence, namely the conduct of the journalist, to determine whether actual malice may be inferred. *See, e.g., Tucci*, 464 A.2d at 169 ("Actual malice may be inferred when an investigation is grossly inadequate in the circumstances."). In doing so, we keep in mind that an "erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the breathing space they need ... to survive." *New York Times*, 376 U.S. at 271–72, 84 S.Ct. 710 (internal quotations and citations omitted). Although *New York Times* and its progeny protect journalists and publishers from liability for errors of fact derived from credible sources, reckless disregard for the truth may be found when a reporter has " 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (quoting *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323).

2. The *Bangor Daily News* published a correction in July, 1994, that read:

The stories incorrectly reported that [Beal] informed Town Manager Christopher Loughlin about the loan. The articles also incorrectly reported that Beal, who works at the Cutler Navy Base, was charged by the Navy with breach of national security, violation of the conflict of interest rules and was reassigned because of the incident.

The town manager stated that it was not Beal who informed him of the radar gun loan.

Navy officials said that Beal was reassigned to a different security post, but the reassign-

ment was part of an overall change in the detail and took place prior to the radar gun incident.

3. The jury answered in the affirmative the interrogatory:

Has Melrose Beal proven by clear and convincing evidence that Bangor Publishing Company and Paul Sylvain published a false and defamatory statement of fact which they knew to be false or which they published while entertaining serious doubts as to their truth or falsity?

## II.

■ [¶ 9] In reviewing a libel action brought by a public figure, we are constitutionally obligated to apply the standard of review articulated in *New York Times v. Sullivan:*

> The rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect. We must make an independent examination of the whole record, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

*New York Times,* 376 U.S. at 285, 84 S.Ct. 710 (internal quotations and citations omitted). The heightened standard of appellate review applies only to the review of the finding of actual malice, and not to the determination of libel. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). We thus independently review the record to "determine whether the record establishes actual malice with convincing clarity." *Id.*

■ [¶ 10] On determinations of credibility, however, we defer to the factfinder because of the factfinder's unique " 'opportunity to observe the demeanor of the witnesses.' " *Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678 (quoting *Bose,* 466 U.S. at 499–500, 104 S.Ct. 1949). We review such credibility determinations for clear error. *See Harte–Hanks,* 491 U.S. at 688, 109 S.Ct. 2678. Ultimately our task in reviewing a verdict for libel in an action brought by a public official is to determine what evidence the jury reasonably accepted as credible, and whether this evidence clearly and convincingly establishes actual malice. *See Harte–Hanks. Inc.,* 491 U.S. at 698–90, 109 S.Ct. 2678; *Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249, 1252 (9th Cir.1997).

## III.

■ [¶ 11] The "sting" of the February 22 and February 23 articles is found in the articles' erroneous assertions that Beal had violated Navy security rules and thus had been reassigned to a remote portion of the Cutler base.[4] Bangor Publishing concedes that Beal was never formally charged with any offense, and that Beal's reassignment occurred months before the radar-gun incident as part of a general base reassignment affecting all civilian guards at Cutler. The logical inference from the article's report of Beal's reassignment was that the Navy considered Beal to be a security risk requiring sequestration from the general public. This defamatory impact of this assertion exceeds the articles' comparatively vague reports of Beal's being verbally reprimanded and admonished by the head of security at Cutler; the articles' treatment of Beal's reassignment erroneously implies that Beal had been formally charged and found guilty by his superiors at Cutler of breaching the base's security regulations. The issue on appeal is whether these statements were published with knowledge of their falsity or with reckless disregard as to their truth.

[¶ 12] Beal offered evidence at trial intended to demonstrate that Sylvain was either aware that his article contained falsities, or that, at a minimum, Sylvain entertained serious doubts about the accuracy of the information contained in his article. Most notably, Beal's union chief steward Richard Richards testified that he met with Sylvain

---

4. The February 22 article read, in part:

A Machias selectman employed as a security guard at the Cutler naval base has been reprimanded for breaching national security and violating conflict of interest rules in connection with an incident involving a town-owned radar gun.

...

A Navy source within the security division said that Beal was disciplined on Feb. 4 "for going off-base with the information."

Beal, who will be eligible to retire later this year, has since been removed from security duties at the entrance to "mainside," the central administrative, support and billeting section of the base.

Beal has been reassigned to a guard shack at the entrance to the more isolated VLF antenna field, where there is little contact with the general public.

on February 18 in the local Machias office of the *Bangor Daily News,* four days before the article at issue was published. Richards testified that he told Sylvain at this meeting that Beal had not filed an official grievance with the union and that Beal had not been officially reprimanded or disciplined by the Navy officials at Cutler.[5] In addition, Richards testified that during this meeting he explained to Sylvain that Beal's reassignment was not due to the radar gun incident, but was part of a general reassignment of all civilian security guards occurring months before the radar gun incident.[6]

[¶ 13] The jury could have rationally determined Richard's testimony to be credible. The jury could have also rationally rejected the rebuttal evidence Sylvain offered to demonstrate that he relied upon credible sources who provided him with a different account of Cutler's response to Beal's involvement in the radar gun incident. With this credibility determination in mind, we conclude that clear and convincing evidence supports the determination that Sylvain's article contains defamatory statements made with knowledge of their falsity or with reckless disregard as to whether they were true or false.

5. Richards testified:

> Q. Was the topic of grievance even discussed with Paul Sylvain—
> A. Yes.
> Q. —in the February 18 meeting?
> A. Yes.
> Q. What did he ask you?
> A. He asked me if there was a grievance pending, and I told him that as of yet there's nothing been—you know, there's been no disciplinary action taken by management.
> Q. So there was nothing to grieve?
> A. Right.

6. Richards testified:

> Q. In your conversation with Mr. Sylvain on February 18th, did you discuss the reassignment of the guards?
> A. Yes.
> Q. In what context? Why did—who brought it up?
> A. I think Mr. Sylvain asked me if Mr. Beal had been reassigned, you know, or assigned to a lower gate. And I told him that the people— all the guards had been taken off the gates as of September of 1993.
> Q. September of 1993?
> A. Right.

The entry is:

Judgment affirmed.

. . .

Q. Did you tell him why the guards had been reassigned?
A. Yes.
Q. And—and why—what did you tell him? Why?
A. I told him that Nancy Brown, the commander of the base, had decided that she wanted to have all the security personnel not carry weapons . . . [and] rather than go through the process of a grievance, that they would just reassign the guards down to post two.

. . .

Q. All right. But if I understand your testimony, you told Sylvain that this happened, but it happened months before?
A. Yes.
Q. And it happened to all the guards and not just Melrose Beal?
A. Yes.

. . .

Q. What was your reaction when you read [the Feb. 22 article]?
A. I was shocked.
Q. Why is that?
A. Because I was the one that gave him the information to do an article on the commander about the reassignment of the guards to—to post two.