2005 ME 86

**Alan J. BALLARD**

v.

**Christopher WAGNER et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 12, 2005.

Decided: June 30, 2005.

Michael A. Feldman (orally), Justin W. Andrus, Law Offices of Michael A. Feldman, Brunswick, for plaintiff.

Thomas J. Freda (orally), Joseph W. Monahan III, Monahan & Padellaro, Cambridge, MA, Neal L. Weinstein, Old Orchard Beach, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Christopher Wagner and the National Association of Government Employees, Local R01–077, appeal from a judgment in a defamation action entered in the Superior Court (Sagadahoc County, *Brodrick, A.R.J.*) in favor of Alan J. Ballard. Wagner contends that the court erred in finding that Wagner defamed Ballard by posting on a website assertions that Ballard (1) failed in his responsibility to oversee the repair of an oil leak at the Brunswick Naval Air Station, and intended to deceive his supervisors as to the existence of the leak; and (2) negotiated a contract with non-union workers against the wishes of his military superiors, and lied about his knowledge of a union contract. Finding no error, we affirm the judgment.

## I. BACKGROUND

[¶ 2] Wagner was the president of local R01–077, National Association of Government Employees, which does contract work at the Brunswick Naval Air Station. Ballard, then a Lieutenant in the United States Navy, was in charge of the Public Works Department (PWD) at the Air Station. The fire department regularly conducts inspections on the base and issues deficiency notices as needed. After conducting inspections on January 13, 2000, the Chief Fire Inspector delivered 125 deficiency violation notices to the PWD. John Bond, a PWD employee, received the January 13 notices in the PWD office. Routinely, the PWD has thirty days to inform the fire department whether it has corrected or abated such alleged violations. Bond instructed an information assistant to enter the notices in the PWD's system, the process by which the PWD employees receive the notices. Despite numerous promptings, the information assistant either was unable or refused to enter the notices. On February 17, Bond informed Ballard that the PWD had missed the deadline for all 125 deficiency notices. As a result, Ballard approved a plan to get the deficiency notices corrected, including authorizing as much overtime as needed.

[¶ 3] After Wagner learned about the deficiency notice problem from the information assistant, he reported the problem directly to the executive officer and the commanding officer without following the chain of command. In response, the commanding officer informed PWD that he wanted the situation involving the deficiency notices resolved immediately, and in a few days the PWD had addressed the majority of the problems. On March 6, 2000, the safety supervisor wrote to Wagner informing him that all the deficiencies had been abated; the supervisor based this letter on information Ballard provided to him.

[¶ 4] One deficiency, however, involving an oil leak from a furnace at a child care center, had probably not been corrected at that time.[1] A PWD employee had been to

---

1. The fire department issues the deficiencies ranging from a Code 1 to a Code 5 violation, with a Code 1 being the most serious. The oil leak at the child care center was a Code 4.

the location described in the deficiency and found no indication of a leak. The employee reported this to Bond and Ballard, and signed a completed deficiency report indicating that he found no leak. Wagner, however, learned from a different source that the oil leak remained unrepaired, and he filed a·complaint with the Occupational Safety and Health Administration (OSHA) about the oil leak and what he described as other safety problems.

[¶ 5] On March 23, 2000, the OSHA inspector conducted an investigation on the base. Wagner accompanied the OSHA investigator during his March 23 inspection. In a report, the OSHA investigator labeled the oil leak serious, and allowed PWD thirty days to fix the problem.[2] The OSHA investigator also found another problem that had not been the subject of a deficiency notice. The remaining problems cited by OSHA were not PWD's responsibility. PWD immediately fixed the oil leak, as well as the other problem. During the course of the inspection, the OSHA investigator showed Wagner the deficiency notice upon which the PWD employee had noted that there was "no leak in space." Thus, Wagner knew that Ballard had been told that the oil leak deficiency was not a problem.[3]

[¶ 6] Meanwhile, on February 25, 2000, Ballard contracted with non-union workers to perform emergency repairs on weeknights and weekends. After signing this contract, Ballard left for a brief trip to Norfolk, Virginia. Soon after, Wagner learned that the emergency services contract was granted to an outside contractor. On February 29, 2000, Wagner, on behalf of his union, negotiated a tentative contract with members of the command for union personnel to perform all evening and weekend emergency work. This conflicted with the contract that Ballard had previously negotiated. When Ballard returned, he called the commanding officer's attention to the conflicting contracts. The commanding officer sided with Ballard and decided to uphold the earlier February 25 contract with the non-union workers, and invalidated the later February 29 contract negotiated with the union. At trial, Wagner testified that he did not know that the contract Ballard had signed was valid until the workers came to the base, but the court found this testimony not to be credible.

[¶ 7] Wagner, who was acting as president of Local R01–77, and on behalf of the union, published a website on the Internet that remained available from March 27, 2000 to June 2, 2000. The website was subtitled: "When telling the truth hurts[:] Dedicated to Exposing Lies at Naval Air Station, Brunswick." The first link from the homepage, entitled "Lie # 1[:] LT Ballard's Little Fib," brought the viewer to a subsequent page, discussing Ballard's negotiation of the contract with non-union workers. The page included the following text: "After contracting out after hours maintenance response for NASB, Lt Ballard, Public Works Officer, told a group of PW[D] workers on March 22, 2000: 'I never saw a· proposal to keep after hours response work in-house.'" This paragraph, as published, contained the word "Lie" in handwriting in the margin. Additionally, at the bottom of the page, it stated, "the work was then contracted out by LT Ballard's ROICC office DESPITE THE 29 FEB 00 AGREEMENT WITH THE COMMAND AND IN SPITE OF THE CO'S AND XO'S APPARENT DE-

**2.** The court found several of the opinions expressed in the OSHA investigator's report to be "unsupported."

**3.** The trial court noted that Wagner acknowledged seeing this report, but that he could not recall seeing the writing. The court found Wagner not to be credible on this issue.

SIRE TO KEEP THE WORK IN–HOUSE."

[¶ 8] The second link from the homepage was entitled "Lie # 2[:] It's Safe Now." This link brought the viewer to a subsequent page discussing the PWD's response to the oil leak in the child care center. The page included the following language: "On 6 March 2000, the Command representative for Safety—based on a report from Public Works—declared that: '. . . . At this time Public Works has informed us that all mentioned deficiencies have been abated and that they were completing NA-VOSH Deficiency notices to provide us with completed paperwork.' " Similar to the first link, in the left-hand margin the handwritten word "Lie" was published. Wagner did not include among the supporting documentation for this page the deficiency notice signed by the PWD employee indicating that there *was* no leak.

[¶ 9] Wagner refused to publish a retraction. Ballard filed a complaint against Wagner and Local R01–077 in Superior Court, seeking, in part, damages for defamation. Following a jury-waived trial, the court decided in favor of Ballard against Wagner and Local R01–077. The court found that the information published on the website regarding the oil leak and the contracts constituted two acts of defamation. The court awarded Ballard $75,000 in damages against Wagner and the Union, holding the Union vicariously liable for Wagner's actions. The court also held a subsequent hearing to determine punitive damages, the court found Wagner alone liable for $20,000 in punitive damages. Wagner and the Local R01–077 filed this appeal.

## II. DISCUSSION

[¶ 10] The plaintiff in a defamation case must prove that the published statements made were defamatory, meaning that the statements harmed his reputation so as "to lower him in the estimation of the community." *Schoff v. York County*, 2000 ME 205, ¶ 9 n. 3, 761 A.2d 869, 871 (citation omitted). Moreover, the plaintiff must prove that the defamatory statements are false. *Id.* ¶ 9; *see also Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). Such words written falsely about a person's profession, occupation, or official station constitute libel per se. *Cf. Picard v. Brennan*, 307 A.2d 833, 834 (Me.1973). A false statement must be "an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." *Lester*, 596 A.2d at 69. If the publication is truly an opinion, however, then it is not actionable. *True v. Ladner*, 513 A.2d 257, 261–62 (Me.1986). In addition, if the plaintiff is a public figure, as Ballard was in this case, there must be proof that the defamatory material was published with actual malice. *See generally New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

[¶ 11] Wagner contends that because his statements on the website reflected his opinion, they are not libelous and are protected by the First Amendment. We disagree. "The determination whether an allegedly defamatory statement is a statement of fact or opinion is a question of law . . . [but if] the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the [fact-finder]." *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me.1984). Such a determination by the fact-finder of whether the alleged defamatory statement is fact or opinion is subject to review for clear error. *See True*, 513 A.2d at 262; *Wells v. Powers*, 2005 ME 62, ¶ 2, 873 A.2d 361, 363. In assessing whether a statement expresses fact or opinion, we look to the

totality of the circumstances and to whether the statement was intended to state an objective fact or a personal observation. *Lester,* 596 A.2d at 71.

■ [¶ 12] "[T]he crucial difference between statement[s] of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." *Caron,* 470 A.2d at 785 (citations omitted). A statement of opinion may be actionable if it implies the existence of undisclosed defamatory facts. *Lester,* 596 A.2d at 71; *see also Caron,* 470 A.2d at 784. Moreover, in assessing whether words are defamatory, they must be "taken in their ordinary and usual meaning." *Judkins v. Buckland,* 149 Me. 59, 64, 98 A.2d 538, 541 (1953).

■ [¶ 13] In this case, the court found that when Ballard reported to his military supervisors that the oil leak and other public works deficiencies had been corrected, he reasonably believed such statements to be true. Even though the documents posted on Wagner's website showed that at the time Ballard reported the oil leak to have been corrected, the leak had, in fact, not as yet been fixed, the court found that Wagner was aware that Ballard was relying on the deficiency notice showing the oil leak to have been fixed, and thus that Wagner was aware Ballard had "very good reason to believe" that the deficiencies had been corrected.

[¶ 14] The clear implication of Wagner's publication of the word "lie" on the page of

the website linked first from "LT Ballard's Little Fib," is that Ballard in fact intended to deceive the base and his command when he announced that the deficiencies had been addressed. Words must be given their general meaning and usage, and the word "lie" includes the making of a false statement, as well as the intent to deceive. Such an assertion about conduct of a naval officer in his official duties is especially serious, and the facts do not support Wagner's contention that he was merely expressing an opinion. Accordingly, the court's finding that the statements were defamatory is not clearly erroneous.

■ [¶ 15] Wagner also contends that Ballard did not meet his burden of proving that Wagner acted with actual malice. We disagree. For a public official to recover in a defamation action,[4] the public official must establish that the defendant acted with actual malice, i.e., that the statements were made with knowledge of their falsity or with reckless disregard for their truth or falsity. *Beal v. Bangor Publ'g Co.,* 1998 ME 176, ¶ 6, 714 A.2d 805, 807. More specifically, there "must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Michaud v. Town of Livermore Falls,* 381 A.2d 1110, 1114 (Me.1978) (citation omitted). The public official must prove actual malice by clear and convincing evidence.[5] *Beal,* 1998 ME 176, ¶ 10, 714 A.2d at 808.

■ [¶ 16] We review the fact-finder's determination of credibility deferentially, for clear error. *Id.* The court did not err

4. Both parties agree that at the time of the publication, Lieutenant Ballard was a public official.

5. Evidence is considered to be clear and convincing if the fact-finder "could reasonably have been persuaded that the required factual findings were proved to be highly probable."

*Shrader–Miller v. Miller,* 2004 ME 117, ¶ 20, 855 A.2d 1139, 1145 (citation omitted). This heightened burden of proof applies only to the finding of actual malice, pursuant to the public official standard. *See generally New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

in finding to a high probability that Wagner acted with knowledge of the statement's falsity or with reckless disregard of the truth of the statement, because (1) Ballard had been informed by the PWC employee that there was no oil leak in the child care center, and thus he believed that it had been addressed when he announced that all the deficiencies were abated or corrected; (2) the OSHA inspector had shown Wagner the completed deficiency forms, including the one specifying that there was no leak at the child care center; (3) Wagner failed to include on his website as part of his supporting documentation the PWD employee's completed deficiency form showing that the oil leak had been corrected, *see Schoff,* 2000 ME 205, ¶¶ 10–11, 761 A.2d at 871–72 (holding that incomplete statements or statements omitting information are false and defamatory); (4) Wagner did not follow the chain of command when he went to see the executive officer or the commanding officer on February 17, and he did not address Ballard directly about the deficiencies, even though he admitted that the reasonable reader of the website would believe that he had followed the chain of command; and (5) in publishing the website, Wagner placed the handwritten word "lie" next to the statement that PWD had abated and completed the deficiencies.

[¶ 17] The court carefully weighed the credibility of the witnesses. It found that at the time Wagner published a statement calling Ballard a liar, Wagner knew or had good reason to know that when Ballard issued his deficiency report indicating the leak had been fixed, Ballard believed the report to be accurate. We defer to the fact-finder's assessment of credibility, and because there is clear and convincing evidence to show that Wagner acted with knowledge that his statement was false, or at least with reckless disregard for its truth, there was no error in the court's finding that Wagner defamed Ballard regarding the abatement of the oil leak.

■ [¶ 18] Wagner also contends that Ballard did not meet his burden of proving defamation involving the statements about the contracting of work to off-base, non-union workers. He argues that the website contained only factually truthful documents, and that a statement must contain a false statement of fact in order to be libelous. *See True,* 513 A.2d at 261. We are unpersuaded by Wagner's contentions. Although Wagner included some accurate documentation on his website, the written word "lie" published in the margin, as well as the statement on the website that Ballard circumvented his command in negotiating a non-union contract, was defamation. The contract that Ballard negotiated was negotiated *before* the union contract negotiated by Wagner. Even if the statements could be said to be opinion, they are defamatory because they imply the existence of defamatory facts, including the fact that Ballard intentionally deceived his command. *See Lester,* 596 A.2d at 71; *see also Caron,* 470 A.2d at 784. The court did not err in finding that the website pages pertaining to the negotiation of a non-union contract were defamatory.

[¶ 19] As the evidence supports the court's finding by clear and convincing evidence that Wagner acted with malice in defaming Ballard, who at the time was a public figure, so too is the finding by the court that Wagner acted with malice for the purpose of punitive damages, *Farrell v. Kramer,* 159 Me. 387, 390, 193 A.2d 560, 562 (1963), supported by the evidence in the record.

Then entry is:

Judgment affirmed.